## Case No. 18,274.

### CHARGE TO GRAND JURY—TREASON.

[2 Spr. 292.] [1]

District Court, D. Massachusetts. March, 1863.

#### TREASON AND KINDRED CRIMES.

[1. Until the year 1861 there were no provisions in the criminal legislation of the United States to punish any measures that had not ripened into an overt act of levying war or actual interference with the administration of the law. All the incipient and preparatory measures, leading to the overthrow of the government, were left without punishment or reprehension.]

[2. After the commencement of the war of the Rebellion congress endeavored to secure the fidelity of officers and employés of the United States by various acts requiring an oath of allegiance from them,—Act Aug. 6, 1861 (12 Stat. 326); Act March 6, 1862 (12 Stat. 354); Act July 2, 1862 (12 Stat. 502); Act July 17, 1862 (12 Stat. 593); and to punish conspiracies to effect treasonable objects, and other acts of disloyalty, or of opposition or interference with the government, falling short of the crime of treason,—Act July 31, 1861 (12 Stat. 284); Act July 17, 1862 (12 Stat. 593); Act March 3, 1863, § 24 (12 Stat. 735).]

[3. A mere conspiracy to overthrow the government does not of itself amount to the crime of treason.

---

[1] [Reprinted by permission.]

Thus, if a convention, legislature, junto, or other assemblage entertain the purpose of subverting the government, and to that end pass acts, resolves, ordinances, or decrees, even with the view of raising a military force to carry their purpose into effect, this alone does not constitute a levying of war.]

[4. A purpose to prevent, by force, the execution of any public law of the United States, generally, and in all cases, is a treasonable purpose, for it is entirely to overthrow the government as to one of its laws; and, if there be an assemblage of men for the purpose of carrying this purpose into effect by force, this will constitute a levying of war.]

[5. The sudden outbreak of a mob, or the assembling of men in order, by force, to defeat the execution of a law in a particular instance, and then to disperse, without any intention of continuing together, or of reassembling for the purpose of defeating the law generally, and in all cases, is not levying war.]

[6. If a body of men be actually assembled in force, in a condition to make war, in order to overturn the government at any one place by force, this is levying war. It is not necessary that the assemblage should be with military arms and array; numbers alone may supply the requisite force.]

[7. If any such assemblage for the purpose of subverting the government at any place take forcible possession of any fort, arsenal, or other property of the United States, this is an act of levying war.]

[8. If war be actually levied at one place, and any person in league with those actually engaged therein send them arms, money, provisions, or intelligence for the purpose of aiding them, he is guilty of treason, however distant he may be from the place of their assemblage. Following Ex parte Bollman, 4 Cranch (8 U. S.) 126.]

[9. Under the constitution, treason or other crime committed within the limits of the United States can be tried only within the state and judicial district within which it is committed, and the accused has the right to a trial by jury in such state and district. If, therefore, the condition of such state or district be such that the federal courts there cannot or will not perform their functions, crimes committed there cannot be punished by the regular administration of justice.]

[10. Although congress has heretofore adopted some of the state laws and modes of procedure, especially those which prescribe the qualifications of jurors and the mode of summoning them, there is no necessity for so doing, or for using any part of the state machinery. The national legislature has constitutional power to prescribe the qualifications of jurors and the manner in which they shall be selected and summoned; it may make the judicial system of the United States complete for the independent exercise of all its functions.]

[11. If a crime has been committed on the high seas, or in any place not within any state or district, and the offender has been legally arrested without the limits of the United States, and brought into any judicial district, he must, under the existing statutes, be tried in that district. If he has been arrested within the United States, he must be tried in the district in which he was apprehended.]

[12. Every person owing allegiance to the United States may subject himself to the penalties of treason. Allegiance is of two kinds.—that due from citizens and that due from aliens resident within the United States. Every sojourner who enjoys our protection is bound to good faith towards our government, and, though an alien, he may be guilty of treason by co-operating either with rebels or foreign enemies.]

[13. Under our complex system of government there is no power extrinsic to that of the national government by which its laws can be rightfully resisted or their obligation impaired.]

[14. The theory, or opinion, that the constitution of the United States does not contemplate making war upon a state, is true only in the sense that a state, as a political body, is not to be compelled to execute the laws of the United States: for those laws act directly upon individuals and are to be enforced by national instrumentalities. But the constitution does contemplate and provide for the contingency of adverse state interposition or legislation to annul or defeat the execution of national laws: for it expressly declares that the national law shall be supreme. "anything in the constitution or the laws of any state to the contrary notwithstanding."]

SPRAGUE, District Judge (charging grand jury). It is your duty to inquire into all offences against the United States within the jurisdiction of this court. The greatest crime known to the law is treason; self-preservation being the highest duty of government. Without it,

there can be no administration of law, civil or criminal. This crime is defined by the constitution itself. It declares that treason against the United States shall consist only in levying war against them, or in adhering to their enemies, giving them aid and comfort. A person may be guilty of treason without himself taking up arms, and even while at a distance from any military assembly. That crime may now be committed within this state, by co-operating with rebels who are in arms, in distant parts of the country; the rule being that "all those who perform any part, however minute or however remote from the scene of action, and who are actually leagued in the conspiracy, are to be considered as traitors." Any person who, knowing that treason has been committed, shall "conceal, and not, as soon as may be, disclose and make known the same" to certain high officers, is guilty of a criminal offence denominated misprision of treason.

Until the year 1861, these were the only provisions of the criminal law for the suppression of acts directly tending to the destruction of the government.

There are indeed statutes making it criminal to obstruct, resist, or impede the execution of legal process, or to assault, beat, or wound any officer or other person duly authorized, in serving such process, or to endeavor corruptly, or by threats or force, to influence any juror, witness, or officer in any court of the United States, or by threats or force to impede, or endeavor to impede, the due administration of justice therein. But these were regarded as minor offences, subjecting the offender only to moderate punishment, by fine and imprisonment.

Under these laws, a marshal of the United States might be forcibly resisted, and he and his aids actually murdered, while in the execution of lawful process within a state, and yet the courts of the United States could sentence the offenders to no higher punishment than imprisonment for one year, and a fine of three hundred dollars. The state law might or might not prohibit such acts, and affix an adequate penalty.

Such was the condition of our criminal jurisprudence for the protection of the life of the government, and to secure the enforcement of the laws, up to the time of the breaking out of this Rebellion. How far it fell short of the duty of congress, is now seen by the light of the conflagration which was permitted to be kindled.

The Criminal Code touched no measure that had not ripened into an overt act of levying war, or actual interference with the administration of the law. All the incipient and preparatory measures, leading to the overthrow of the government, were left without punishment or reprehension.

Since the commencement of this Rebellion, congress has, by penal enactments, endeavored to secure the fidelity of officers and employés of the United States.

There are several statutes prescribing new oaths of office, and affixing the penalties of perjury to their violation. The first was passed in August, 1861 (Acts 1861, c. 64; 12 Stat. 326), and requires, that every officer, clerk, or employé in the several departments of the government, or in any way connected therewith, shall take an oath to support and defend the constitution and government of the United States against all enemies, whether domestic or foreign, and to bear true faith, allegiance and loyalty to the same, any ordinance, resolution, or law of any state convention or legislature to the contrary notwithstanding. Here, you will observe, is a most important and striking provision, unknown to any previous official oath. It requires not only fidelity to the government, but the support and defence thereof against all enemies, domestic as well as for-

eign. Nor is this all; there is added this emphatic language: "Any ordinance, resolution, or law of any state convention or legislature to the contrary notwithstanding." This, gentlemen, is a most explicit renunciation and abjuration of the deadly heresy of a paramount state sovereignty,—that heresy which has been so persistently and successfully inculcated for many years past, especially in the Southern states, and has at length produced the bitter fruit of open rebellion. This doctrine of paramount state sovereignty, and of paramount state allegiance, has taken possession of the minds of tens of thousands; nay, has become public opinion in several states, and this not only against the whole spirit of the constitution, but in the face of its most express and emphatic language.

Our fathers foresaw this danger, and most carefully guarded against it. They meant to create a government with the highest attributes of sovereignty, and with the power of self-preservation. They marked out the sphere of that government with all practicable clearness and precision, and within that sphere made it supreme.

They took especial care that this supremacy should not be left to inference. The sixth article of the constitution declares, in express terms, that "this constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land."

This seems to be sufficiently positive and unequivocal. But the framers of the constitution did not stop even there, but added these words: "any thing in the constitution or laws of any state to the contrary notwithstanding;" thus pointedly and laboriously, in words as apt and expressive as our language affords, guarding against and repelling the idea, that a state could by any act, however solemn, even by its organic or fundamental law, resist or interfere with the constitution and laws of the United States, in their operation over the whole country. And yet the doctrine that the laws of the United States, constitutionally enacted, are not supreme, but that the law of a state may override them, and even authorize its inhabitants to rise up in resistance and overthrow the government, has been not only theoretically maintained, but carried into actual and direful practice. The disastrous consequences of this heresy of paramount state allegiance cannot be measured. We have seen some of them, but the end is not yet. Under its influence, we have seen the government, in the incipient stages of a great rebellion, when its life was threatened and its very existence at stake, stand as inactive as if struck with paralysis. At such a time, we have seen the chief magistrate of this great country looking on as if in utter helplessness, taking no efficient measure, either of prevention or repression, but declaring, in a solemn message, that the constitution did not contemplate making war upon a state,—a declaration which, in its application to the then condition of the country, meant that if a state saw fit to make a law to overthrow the government of the United States, and resist the execution of its laws, the government has no right, in order to enforce the laws and maintain its authority, to put down such resistance by using the requisite force; that is, that the state law is to be supreme, and practically triumphant over the constitution and laws of the United States.

Under the influence or pretence of this doctrine, we have seen high functionaries and officials, of almost every grade, guilty of the most appalling perfidy. We have seen them plotting and taking actual measures for the destruction of the government, while trusted and paid to preserve and protect it. We have seen even

officers of the army and navy, of almost every grade, who had been educated, supported, cherished, and honored by the United States, and with whom we had supposed that loyalty and devotion to their country and their flag was both a sentiment and a principle,—we have seen such men, not only deserting their country and their flag in the hour of approaching peril, but plunging into the crime of treason, and actually joining, and some of them leading, the forces of the rebel enemy. Surely it was time that congress should take more effectual measures for the suppression and prevention of such atrocious perfidy. This statute of August 6, 1861, so far as it went, was well adapted to that end. It is limited, as we have seen, to employés in the executive departments, or persons connected therewith. By statute of March 6, 1862, the same oath is required of ship-masters, on clearing for a foreign country, or for any port in the United States. Acts 1862, c. 38; 12 Stat. 354.

By the act of July 17, 1862, persons making claims against the United States are required to take the same oath. Acts 1862, c. 205; 12 Stat. 610.

By statute of July 2, 1862 (Acts 1862, c. 128; 12 Stat. 502), every officer, civil, military, and naval, is required to take an oath that he has not voluntarily borne arms against the United States, or voluntarily given aid, counsel, or encouragement to persons engaged in armed hostility thereto; that he has neither sought, accepted, nor exercised any office under an authority hostile to the United States, nor yielded a voluntary support to any such authority within the United States; and, further, to support and defend the constitution of the United States against all enemies, foreign and domestic, and to bear true faith and allegiance to the same, and that this obligation is taken without any mental reservation or purpose of evasion; and that he will well and truly discharge the duties of his office. This oath does not contain the special clause against state assumptions which is found in those I have before mentioned. It does not in terms name the ordinance or law of any state, but its comprehensive language clearly embraces them. The falsely taking this oath of office is made a criminal offence, which not only subjects the party to the penalties of perjury, but ever afterwards disqualifies him from holding any office under the United States.

I have called your special attention to these recent statutes, because they create new offences. There are two others of great importance.

By an act passed in July, 1861 (Acts 1861, c. 33; 12 Stat. 284), it is provided that if two or more persons within any state or territory of the United States shall conspire together to overthrow by force the government of the United States, or to levy war against it, or by force to oppose the government, or to prevent, hinder, or delay the execution of any law of the United States, or to seize any property of the United States, against its authority, every person so offending shall be guilty of a high crime.

The statute of July 17, 1862 (Acts 1862, c. 195, § 2; 12 Stat. 590), makes it a criminal offence to incite, set on foot, assist or engage in, any rebellion or insurrection, or to give aid and comfort thereto. These statutes reach the incipient steps which lead to resistance and rebellion.

Previous to their enactment, any person might, by words or acts, stir up and incite others to rebellion, or actually enter into conspiracies, and take preparatory measures for the destruction of the government, without being subject to any legal penalty. Those who were plotting and preparing treason were not compelled to secrecy or concealment. They were not driven to cellars or caverns, the appro-

priate scenes for such dark and nefarious machinations. But they were carried on in open day, in public buildings and halls of legislation. We have seen incitements to rebellion by every art that could mislead the mind, or inflame the passions. We have seen conspiracies in almost every form. Even legislative bodies and public conventions have assembled for the purpose of devising plans and carrying out measures for the overthrow of the government, and they have prosecuted their work by public ordinances and declarations, and made preparations for actual hostilities; and all this with legal impunity, there being no statute of the United States by which any one of these conspirators could be arrested as a criminal. And yet congress has always had the power to pass statutes of prevention. It was given to them by the people for the preservation of the government. This power was vested in congress to be exercised; and it is not too much to say, that, if congress had performed that duty by passing these statutes thirty years ago, and they had been faithfully executed, the dire catastrophe in which our country is now involved would probably have been prevented. This forces upon us the pregnant inquiry, why was this duty so long neglected? Why, for more than seventy years, was the life of the government thus left exposed to the machinations of its enemies? The cause is to be found in excessive jealousy of the power of the federal government, and apprehension, real or pretended, of danger to the states. The fear that the states might be overwhelmed, or encroached upon by the national government, although sometimes feigned, has no doubt been actually felt by many persons. Although most prevalent in the Southern states, it has not been confined to them. This jealousy and apprehension have greatly affected the practical working of our political system from a very early period. They have persistently magnified the sovereignty of the states, and belittled that of the nation. They have been reluctant to admit that the constitution established a government, but have chosen rather to call its work a confederacy, a compact, or a league. They have not only sought after such construction of the constitution as would pare down the powers conferred by it, but have prevented the exercise by congress of many unquestionable powers which were vested in it for the public safety. The criminal legislation which I have referred to, is but one example of omission and neglect by the national legislature in executing the high trust which has been confided to it.

Upon a superficial view, there seems to be some reason for this apprehension of danger from the great powers vested in the national government. It may raise money to an unlimited amount by imposts and taxation, both direct and indirect. It may raise and support armies and navies without restriction. It creates offices at will, and determines the compensation of thousands of public officers and agents; and the chief executive power is vested in the hands of a single magistrate. Without further enumeration, this seems, at first view, to constitute a great and formidable central power, which may be antagonistic and dangerous to the several states.

But let us see how this Colossus is constituted and sustained. The house of representatives is the most important branch of congress in matters of legislation. There all bills for raising revenue must originate. Without its concurrence, no revenue can be provided or funds raised, no money can be appropriated, no armies or navies can be raised or maintained, no offices be created, or compensation provided for, and paid. In fine, without its assent, there can be no act of legislation.

The house of representatives is composed wholly of members from the several states. They have there had their birth and education.

There are their families, friends, associations, and homes. Nearly all of them have held state offices, or been members of the legislature, and become imbued with the predilection for state authority and devotion to state aggrandizement which such positions are likely to generate. At the expiration of the term for which they were elected, they must generally return to the mass of the people from which they were taken. But what is still more effective in controlling their action is the power which the people of the state hold over their future political existence. They are chosen for only two years, and they cannot be re-elected without the favor of the people. This power was deemed by the authors of our institutions a sufficient security against any encroachments upon the rights of the people of the several states.

It has been found even more potent in its practical operation than they had contemplated. They secured to members perfect freedom of debate, and certain means of information, that they might be able to form a correct judgment, and gave to them personal immunities and a certain tenure of office, that they might independently and conscientiously follow the dictates of their own informed understandings. But, in practice, almost every representative holds his own judgment in entire subjection to the will of his constituents. No matter how cogent the facts, or unanswerable the reasoning for or against any measure, he deems it a sufficient answer to say, "My constituents think otherwise." He takes an official oath, and those who have taken no such oath control his action. He hears the discussion, receives information and light from all parts of the country upon great measures affecting the whole nation; and others, at their distant homes, who have not heard the discussion, nor received that information, nor obtained that light, decide the question. Thus, instead of acting as a member of a deliberative assembly, he becomes in effect an ambassador, or diplomatic agent, with instructions in his pocket, and is constantly watching for indications of the will of a distant power, to which he yields implicit obedience.

The members of the senate have the same antecedents and predilections, and are equally devoted to state interests and submissive to state will. They are elected by the legislatures of the several states: and those bodies claim the right to give instructions to senators which shall be absolutely binding upon them. In nearly all the states, this asserted right has been freely exercised, and rarely indeed has a senator hesitated to render the most implicit obedience. Their term of office is six years; but the senate is divided into three classes, so that one-third may go out at the end of every two years, a number which may often be sufficient, in the division of parties, to change the political majority. In four years, two-thirds of the whole body may be changed by new elections.

The president and vice-president of the United States are taken from among the people, by popular vote in the several states, the interposition of electors being now merely a formal mode of declaring the popular will. No other officers, except the judges of the courts, have any constitutional tenure of office, and almost all are removable at the pleasure of the chief executive. Upon a change of president, the whole catalogue of these officers may be displaced. Thus the people of the states, by frequent elections, added to the moral influence of education, habit, and local ties and associations, hold the most effective control over public officers and the whole legislative and executive action of the government. Indeed, our whole system rests upon the states. Archimedes could not move the world because he had no fulcrum beyond its surface. And our great national government has no place beyond the limits of the states, upon which it can stand to wield its power to their

injury. It may be formidable to foreign nations, because it has a position without and independent of them.

The "Federalist," a work written by three of the most eminent statesmen and jurists of their age, declares that "it will always be far more easy for the state governments to encroach upon the national authorities, than for the national government to encroach upon the state authorities." The Federalist, No. 17. This prediction has been verified by experience. Many portions of our history might be cited. Three events only can now be adverted to.

The first is the Virginia Resolutions of 1798. These celebrated resolutions assert that in case of the exercise by congress of a dangerous power, not granted to them, a state has a right to interfere, and arrest the progress of the evil. How it may interfere is not explained. Some have insisted that the resolutions intended to assert a right to interpose by forcible resistance. Others, and among them Mr. Madison, the most eminent constitutional lawyer who participated in those resolutions, always understood them to intend only peaceable interposition, as by remonstrance, argument, or solemn declarations of opinion. The language of the resolutions is vague and indefinite, and probably left so by design, to secure the assent of persons holding widely different opinions. There can be no doubt that these resolutions have generated opinions and measures adverse to the legitimate authority of the federal government.

The next event to be now noticed is nullification. This also professed to touch such acts only as are unconstitutional. The doctrine was, that, if a state deem any law of congress to be unconstitutional, it may nullify it by its own declaration, and then resist it by force. It did not deny that enactments made pursuant to the constitution were the supreme law of the land throughout its whole extent, and of universal obligation: but it arrogated for a state the right to decide, in the last resort, whether a law was constitutional or not; thus denying the supremacy of the judiciary of the United States, and overthrowing one of the great departments of the national government. More than thirty years ago, this heresy had obtained such prevalence as to be formidable. The intelligence and patriotism of the country were aroused, and it was examined, exposed, and exploded.

We next come to the secession of the present day. The advocates of this doctrine deny that the United States has any sovereignty, or can claim any allegiance: although the constitution confers the highest powers of sovereignty, and makes its authority supreme, and defines the crime of treason, which can be committed only by those who owe allegiance. In the face of the whole purpose of the constitution, and of its positive and express provisions, they deny that it created a government. They delight to call our political system a compact, and assume that, if it be so, they may, of course, destroy it at pleasure: as if to violate compacts was an inalienable right. They do not rest upon the ultimate right of revolution, to throw off intolerable oppression, but claim a legal right to resist all law, and overthrow the constitution itself. And the question now is, whether our government can withstand this last most desperate and atrocious assault, or whether it must fall, and bury us and the hopes of mankind in its ruins.

There are other recent enactments to which I would call your attention. The statute of July 16, 1862 (Acts 1862, c. 180; 12 Stat. 577), makes it a criminal offence if any member of congress, or any officer of the government of the United States shall receive, or agree to receive, any valuable consideration for procuring or aiding to procure any contract, office or place from the United States, or any department or

officer thereof, or for giving such contract, office or place; also, if any person shall give, or offer, or agree to give, any valuable consideration for promising or aiding to procure any contract, office, or place as aforesaid. The same statute provides, that, if a member of congress shall receive, or agree to receive, any valuable consideration for his attention to, services, action or vote, on any question, matter, or proceeding which may be then pending, or may, by law, or under the constitution, be brought before him in his official capacity, he shall be liable to indictment, and to be punished by fine and imprisonment in the penitentiary. And any member of congress, or officer of the United States, who shall be convicted of any such offence, is moreover disqualified from holding any office under the United States.

The statute of August 6, 1861 (Acts 1861, c. 56; 12 Stat. 317), makes it a criminal offence to recruit soldiers or sailors to engage in armed hostilities against the United States, or to open a rendezvous for such enlistment. And every person who shall be so enlisted or engaged shall also be liable to fine and imprisonment.

By a statute passed on the third day of the present month (Acts 1863, c. 75, § 24; 12 Stat. 735) it is made a criminal offence to procure or entice, or attempt to procure and entice, a soldier in the service of the United States to desert; or to harbor, conceal, or give employment to a deserter: or to carry him away, or to aid in carrying him away, knowing him to be such; or to purchase from any soldier his equipments, or clothing, or any part thereof. And if any commanding officer of any ship or vessel, or any conductor of any railroad, or any other public conveyance, shall carry away any such soldier as one of his crew or otherwise, knowing him to have deserted, or shall refuse to deliver him up to the orders of his commanding officer, such person also is liable to be punished by fine and imprisonment.

The same statute provides, that if any person shall resist a legal draft of soldiers into the service of the United States, or shall counsel or aid resistance thereto, or shall assault or obstruct any officer in the performance of any service in relation to such draft, or shall counsel any person to assault or obstruct any such officer, or shall counsel any drafted men not to appear at the place of rendezvous, or wilfully dissuade drafted men from the performance of military duty as required by law, such person shall be liable to indictment.

We have seen it stated in such form as to arrest attention, that unauthorized individuals have entered into communication with members of parliament and foreign ministers and officers, in order to influence their conduct in controversies with the United States, or to defeat the measures of our government. It ought to be known that such acts have long been prohibited by law. By a statute passed in the year 1799, c. 1, it was enacted: "If any person, being a citizen of the United States, whether he be actually resident, or abiding within the United States, or in any foreign country, shall, without the permission or authority of the government of the United States, directly or indirectly, commence, or carry on, any verbal or written correspondence or intercourse with any foreign government, or any officer or agent thereof, with an intent to influence the measures or conduct of any foreign government, or of any officer or agent thereof, in relation to any disputes or controversies with the United States, or defeat the measures of the government of the United States: or if any person, being a citizen of, or resident within the United States, and not duly authorized, shall counsel, advise, aid or assist in any such correspondence, with intent, as aforesaid, he or they shall be deemed guilty of a high misdemeanor," and punished by fine and imprisonment. 1 Stat. 613.