## ENFIELD v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit. October 20, 1919.)

No. 5244.

1. **ARMY AND NAVY** &#9758;40—**ESPIONAGE ACT; FORCIBLE INTERFERENCE WITH DRAFT.**

Forcible interference with the operation of the draft under the Selective Service Act constitutes the offense of "willfully obstructing the recruiting or enlistment service," within Espionage Act, tit. 1, § 3 (Comp. St. 1918, § 10212c).

2. **CONSPIRACY** &#9758;27—**OVERT ACT; FORCIBLE INTERFERENCE WITH DRAFT.**

Espionage Act, tit. 1, § 4 (Comp. St. 1918, § 10212d), prescribing punishment for conspiracy to violate section 2 or 3 (Comp. St. 1918, § 10212b, 10212c) of the act, where an overt act is committed, supersedes Criminal Code, § 37 (Comp. St. § 10201), as to such offenses, but does not supersede Criminal Code, § 6 (Comp. St. § 10170), making it an offense to conspire to oppose the authority of the United States by force, and a conspiracy to oppose enforcement of the Draft Act by force may be prosecuted thereunder, although no overt act is charged.

3. **CRIMINAL LAW** &#9758;338(4, 5)—**EVIDENCE OF CONSPIRACY TO OPPOSE DRAFT.**

On trial of defendant for conspiracy to oppose enforcement of the draft by force, admission of evidence of a highly seditious and disloyal speech by a third person, with whom defendant was not shown to have any connection, *held* reversible error.

In Error to the District Court of the United States for the Western District of Oklahoma; John H. Cotteral, Judge.

Criminal prosecution by the United States against Orville E. Enfield. Judgment of conviction, and defendant brings error. Reversed and remanded.

H. L. Adkins, of Higgins, Tex. (R. E. Echols, of Elk City, Okl., on the brief), for plaintiff in error.

Redmond S. Cole, Asst. U. S. Atty., of Pawnee, Okl. (John A. Fain, U. S. Atty., of Lawton, Okl., on the brief), for the United States.

Before CARLAND and STONE, Circuit Judges, and AMIDON, District Judge.

STONE, Circuit Judge. Writ of error from conviction for conspiracy to oppose by force the enforcement of the Selective Service Act (Act May 18, 1917, c. 15, 40 Stat. 76), and the presidential proclamations made in pursuance thereof. The assignments of error may be classified as follows: (1) Insufficiency of the indictment; (2) refusal to require election between the two counts; (3) insufficiency of the evidence; (4) improper admission of evidence; and (5) refusal to charge that certain witnesses were accomplices, whose testimony must be corroborated.

The indictment was against Enfield and one Pickens, who was acquitted by the jury. The first count charged that Enfield, Pickens, and other named persons have continuously and at all times, between June 5, 1917, and August 6, 1917, conspired to hinder, delay, and prevent

certain named persons, and others who had registered and were subject to draft service, from being inducted into that service, by arming themselves and offering armed resistance to induction into the army. The second count was to the same effect, with the addition of overt acts, in that on or about July 29, 1917, defendants went to the residence of J. S. Beers and advised, induced, instructed, and procured J. S. Beers and Mark Beers to obtain guns and ammunition and to go, on that date, to named persons, and others unknown, to request and demand that said persons also procure guns and ammunition, and thus armed, to meet with defendants J. S. Beers and Mark Beers at or near the Luthi schoolhouse for the purpose of discussing plans for and organizing to obstruct the recruiting and enlistment service, and that a portion of such persons (not including defendants) did, on or about July 30, 1917, meet about a half mile from such schoolhouse, armed and for the above purposes. The insufficiency of the indictment is claimed on the ground that no statement of material facts, necessary to bring the case within the statute, has been substantially set forth. Each count charges conspiracy, between certain dates, to procure arms and ammunition, and to offer armed resistance to the induction into the army of men qualified therefor and registered under the Selective Service Act. This is sufficient so far as particularity of statement is concerned.

It is also urged that section 4 of the Espionage Act (Act June 15, 1917, c. 30, tit. 1, 40 Stat. 219 [Comp. St. 1918, § 10212d]) is applicable to this case, and, being special legislation, excludes the application of sections 6 and 37 of the Penal Code (Act March 4, 1909, c. 321, 35 Stat. 1089, 1096 [Comp. St. §§ 10170, 10201]). If this be true, the results must be that the first count of this indictment is bad, because no overt act is alleged therein, and that the penalty is determined by sections of the Espionage Act. Sections 6 and 37 of the Penal Code were enacted before the war. Section 6 deals with seditious conspiracies to forcibly resist the authority of the government. Section 37 refers generally to conspiracies to violate national laws. Under section 6 no overt act was necessary, while under section 37 the overt act was required.

[1] Section 4 of the Espionage Act covers conspiracies to violate sections 2 and 3 of that act (Comp. St. 1918, §§ 10212b, 10212c). It provides that "except as above provided conspiracies to commit offenses under this title shall be punished as provided by section thirty-seven of the act to codify, revise, and amend the penal laws of the United States approved March fourth, nineteen hundred and nine," thus showing that this section was expressly intended to replace section 37 in those cases to which it is applicable; that is, where the purpose of the conspiracy is to violate or secure the violation of sections 2 and 3 of the Espionage Act. Section 3 of that act makes it a crime to "willfully obstruct the recruiting or enlistment service of the United States." The purpose of the conspiracy charged in this indictment was to forcibly interfere with the operation of the draft, under the Selective Service Act and presidential proclamations in pursuance thereof. The draft is comprehended within the expression "recruiting or enlistment

service," as used in section 3 of the Espionage Act. Therefore the conspiracy here charged falls within section 4 of the Espionage Act.

[2] But the fact that section 37 is expressly supplanted does not mean that section 6 is impliedly replaced. Both sections 6 and 37 have been law for years, and it has never been thought that they were inconsistent, although the broad language of section 37 might well cover all manner of conspiracies against the United States, whether or not such contemplated the employment of force. Section 6 has been regarded as reaching the very serious situation of incipient rebellion, and designed to halt such in its first stages. See Charge to Grand Jury, Fed. Cas. No. 18,274, 2 Spr. 292. If in peace times such a statute was regarded as essential, it should require something more than implication to strike it down in war times and as applied to the war activities themselves. On the other hand, it must be said that section 4 of the Espionage Act undoubtedly is applicable to all manner of conspiracies to violate sections 2 and 3 of that act, whether or not force is contemplated in the conspiracy. The fact that the Espionage Act requires an overt act to complete the crime, which is made punishable up to 20 years' imprisonment, is not inconsistent with the declaration of the Penal Code that the bare conspiracy to use force, with no overt act, is also a crime, and punishable up to 6 years' imprisonment. The result is that section 6 is fully applicable to bare conspiracies to forcibly oppose the enforcement of the Selective Service Act, and that, where an overt act has followed, section 4 of the Espionage Act is also applicable. The motion for election was properly overruled. It may be added that since the second count, covering the conspiracy with overt act, was certainly applicable, since the sentence thereunder was greater than under the first count, and since the sentences run concurrently, the defendant in error was not prejudiced by the ruling.

It is earnestly urged that the evidence is insufficient to sustain the conviction. The entire evidence has been carefully studied, and presents a clear-cut issue of fact for the determination of a jury. It is true that the vital testimony for the government came from two self-confessed co-conspirators, who were exceedingly active in connection with the overt acts alleged, and who understood that they were saving themselves by turning state's evidence. The court, however, very properly and carefully cautioned the jury as to evidence from such sources.

[3] The final contention is that evidence of the desertion of a brother of Enfield, and evidence of a highly vicious and inflammatory speech by one Hicks, were improperly admitted. These assignments are well taken. We cannot doubt the highly prejudicial effect of this testimony. Enfield was in no way shown to be connected with, or responsible for, the desertion. Hicks was, according to the evidence, an ex-convict, fraudulently claiming to represent organizations which did not know of him, or which had no real existence. He was making inflammatory, anarchistic speeches, intended and calculated to incite lawlessness in connection with the prosecution of the war. He was under indictment at the time of this trial for some of these very utterances. When the government began introducing testimony as to Hicks and his utterances, objection was made that such evidence was irrelevant. The

assurance was then given that Hicks would be connected with Enfield in the conspiracy charged. This assurance was not fulfilled.

The particular speech by Hicks which was introduced was delivered in the afternoon, at Arnett, Okl. That day a large all-day public meeting of the people of that neighborhood was held at Arnett. It had been advertised that both Hicks and Enfield would speak. Enfield, who lived some miles away on a farm, without telephone, testified that he had seen none of the advertisements, and did not know until he reached Arnett that Hicks was to speak; that he then refused to speak, until a number of friends urged him to do so, because they had come to hear him; that he announced at the beginning of his speech that there was no connection between Hicks and himself. He spoke in the morning, in the courthouse. Hicks spoke in the afternoon, in front of the courthouse, and again that night. Enfield heard at least part, if not all, of Hicks' speech. The only evidence of approval by Enfield was by one witness, of clearly limited capacity, who answered "Yes, sir," to the following very suggestive question: "Did you see him applaud Hicks when he made a point against the war—against the draft?" Several witnesses, who had heard portions of both speeches, testified that they were similar. A portion of Hicks' extended speech had been taken by a stenographer. Upon the above slender basis this portion was introduced against Enfield. It was a vicious, scurrilous, seditious outburst against the government, which would naturally inflame the righteous anger of every patriotic man upon the jury. Enfield was not shown to be in any way responsible for this speech, nor was it properly shown that he in any wise approved the highly intemperate passages introduced.

For the error in admitting this testimony of Hicks' speech, and concerning the desertion of Enfield's brother, the judgment is reversed, and the case remanded for new trial.