[Civ. No. 34178. Second Dist., Div. Five. July 17, 1970.]

SALVATORE B. CASTRO et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

## COUNSEL

Oscar Acosta, Neil M. Herring, Paul M. Posner, Herman Sillas, Jr., Herbert E. Selwyn, Ralph M. Segura, A. L. Wirin and Fred Okrand for Petitioners.

No appearance for Respondent.

Evelle J. Younger, District Attorney, Harry Wood, Maurice H. Oppenheim and Arnold I. Guminski, Deputy District Attorneys, for Real Party in Interest.

## OPINION

**KAUS, P. J.**—As a result of our decision in this writ proceeding and the passage of time, several of the petitioners who, according to the evidence presented to the grand jury, clearly committed or aided and abetted in the commission of several misdemeanors, may never be tried for those crimes. We share the view of anyone who thinks that this is a most undesirable result. We stress, however, at the outset, that with one minor exception

noted herein, the authorities did not choose to charge the misdemeanors. This opinion therefore cannot and a fortiori does not deal with crimes which, at the time of their public commission, generated considerable notoriety.

Petitioners, Salvatore B. Castro, Moctezuma Esparza, Henry Gomez, Frederic Bernard Lopez, Carlos Michael Montez, Carlos Munoz, Gilberto Cruz Olmeda, Ralph Luna Ramirez, Joe Angel Razo, Eliezer Lozado Risco, David John Sanchez, J. Patricio Sanchez, Richard Vigil, seek a writ of prohibition to restrain the Superior Court for the County of Los Angeles from proceeding to try them on an indictment which originally contained 16 counts. In various ways these were reduced to three. These are: count VIII which charged petitioners, Frederic Bernard Lopez, Gilberto Cruz Olmeda, Ralph Luna Ramirez and David John Sanchez, with a misdemeanor violation of section 415 of the Penal Code (disturbing the peace), on March 5, 1968; count XV which charges all petitioners with a conspiracy to violate section 16701 of the Education Code, which at the time read as follows: "Any person who wilfully disturbs any public school or any public school meeting is guilty of a misdemeanor, and punishable by a fine of not less than ten dollars ($10) nor more than one hundred dollars ($100)"; and count XVI which charged all petitioners with conspiracy to "disturb the peace and quiet of the neighborhood encompassing [four designated high schools] and persons in the proximity thereof, by loud and unusual noise and by tumultuous and offensive conduct, and in a loud and boisterous manner. . . ."

The evidence before the ground jury showed that between March 5 and March 8, 1968, there occurred certain disturbances at four high schools in Los Angeles. Essentially these took the form of a large number of Mexican-American students attempting to leave or actually leaving the school grounds and attending protest meetings. The alleged reason for these so-called "walkouts" was a protest against conditions in the schools which were claimed to provide the students with inferior education.[1]

---

[1]The nature of the grievances is illustrated by the demands published on March 7 at one of the schools: "1. Class size will be reduced so that teachers can be more effective in the classroom and devote more time to each student. Team teaching approach will be used. 2. New high schools in the area be built immediately. The present local schools should be re-named to help establish community identity. 3. Counselor/student ratios should be reduced. All counselors should be able to speak Spanish. 4. Library facilities should be expanded at all East L.A. high schools to meet minimum requirements. 5. The Industrial Arts program must be re-vitalized and modernized. 6. Open-air student eating areas should be made into roofed malls.

"7. All buildings already condemned sould [sic] be razed and new structures erected immediately. 8. All high school campuses will be open. Fences should be removed. 9. Entrances to all buildings and restrooms should be accessible to all students during school hours. 10. School janitorial services should be restricted to employees hired

Several petitioners actively encouraged students to leave school during school hours.[2] Unquestionably several petitioners and quite a few students committed a number of misdemeanors—not limited to those crimes petitioners are charged with having conspired to commit.[3] Many of these appear to have been spontaneous. Several, however, were inferentially planned in advance, though not necessarily by petitioners or, at least, by all petitioners. Illegal acts committed at the scene of the walkouts covered the spectrum from morally reprehensible to relatively technical violations of law. Without deciding that the matters about to be mentioned constituted violations of those portions of section 415 of the Penal Code which petitioners are accused of having conspired to violate, we briefly mention what appear to us to be the most serious transgressions, without duplicating any conduct described in the next preceding footnote:

1. On March 5, at Garfield High School threats and "obscenities" were hurled at police officers and school officials;

2. At Roosevelt High School on March 6 several petitioners caused a chain by which a gate to the school was closed to snap open, permitting about two hundred students to leave the school premises;

3. At Belmont High School on March 7 garbage cans were tossed down the steps by students and fire alarms were broken. Fires were set in trash cans and fights broke out. Rocks and bottles were thrown. None of petitioners were shown to be directly involved;

for that purpose. 11. The guidance program should be realistic, with newer and better methods developed. The present I.Q. tests will be abolished and valid student testing techniques developed in their place. 12. Teachers should become more aware of the social and economic problems of the community. 13. Proper emphasis should be given to student violations—just what is the punishment being given for? what is the standard penalty for a standard infraction of rules? who settles disputes over rules and the punishment assigned?"—Some of the signs carried by participants in the demonstrations read: "WE DEMAND SCHOOLS THAT TEACH," "EDUCATION NOT CONTEMPT," "WE WANT GOOD EDUCATION," "BROWN IS BEAUTIFUL"; and "GOOD SCHOOLS FOR ALL."

[2] It should be noted that there is no specific law against urging a student to leave school for a brief period. Section 12401 of the Education Code at the time defined a truant as follows: "Any child shall be reported as a truant, within the meaning of this article (commencing at Section 12401), who has been absent from school without valid excuse more than three days or tardy in excess of 30 minutes on each of four or more days in one school year."

[3] For example: at least one petitioner handed out bottles which were thrown at police cars (Pen. Code §§ 240, 241); four petitioners directed students to block traffic by sitting in the street (Pen. Code §§ 370, 372); several petitioners flagrantly violated section 13558.5 of the Education Code, prohibiting nonstudents to enter school grounds and to interfere wilfully with the operation of a school with the intent to disrupt it. Some of these violations also appear to have been violations of section 602.9 of the Penal Code, since repealed and replaced by section 626.8 of that code. (Stats. 1969, ch. 1424.)

4. The next day, again at Belmont, a few rocks were thrown by students and cherry bombs were ignited. Again no involvement by any petitioner was shown.

Apart from the charge contained in count VIII these violations are not before us, except to the extent that their commission and the aiding and abetting of their commission by some petitioners is circumstantial evidence[4] of the felonies charged in counts XV and XVI. The thrust of those counts is simply that petitioners, none of whom was a student at any of the schools affected,[5] planned the walkouts and took certain steps—"overt acts"— toward the accomplishment of their objective.

Petitioners attack the indictment on several fronts. They claim: 1. that the grand jury was unconstitutionally constituted;[6] 2. that the evidence before the jury does not support the indictment, even if one disregards alleged constitutional frailties; 3. that, if they are mistaken on that point, it failed to show any connection between the conspiracy and five particular petitioners; 4. that the People have alleged a single conspiracy, whereas the evidence, at most, shows several separate conspiracies; 5. that the evidence conclusively shows that petitioners were merely exercising First Amendment rights of free speech and assembly and that, whatever the definition of the crimes charged may be under California law and however adequate the proof may be that they came within such definition, the state cannot constitutionally punish them; 6. that section 16701 of the Education Code is unconstitutionally vague; 7. that section 415 of the Penal Code is unconstitutionally vague; 8. that section 16701 of the Education Code is overbroad; 9. that section 415 of the Penal Code is overbroad; 10. that a prosecution for conspiracy to violate the misdemeanors involved constitutes, because of its chilling effect on free speech, a denial of due process; and 11. that a prosecution for conspiracy to violate the misdemeanors involved constitutes cruel and unusual punishment.

A shifting majority of this court has reached the conclusion that for the reasons set forth in this and the two concurring opinions a writ of prohibi-

---

[4]There is some weak direct evidence from a very reluctant witness that a bare handful of petitioners may have planned what turned into the "walkouts." There is no direct evidence that any of petitioners planned to commit violations of section 415 of the Penal Code or section 16701 of the Education Code.

[5]Petitioner Castro was a teacher at one of the schools.

[6]In addition to a motion to set aside the indictment under section 995 of the Penal Code, petitioners made a motion to quash the indictment. The transcript of these proceedings covers more than 1,000 pages. Petitioners claim that a class to which they belonged, "Spanish surnamed persons," has been chronically underrepresented on the Los Angeles Grand Jury and that such underrepresentation resulted from actual and presumed discrimination against the class.

tion against the further prosecution of petitioners on counts XV and XVI should issue.

We dispose of the misdemeanor charge contained in count VIII by returning it to the superior court for certain proceedings outlined in this opinion.

### CONSPIRACY TO DISTURB THE PEACE—COUNT XVI.

The views set forth in this part of the opinion represent only those of the writer. Justice Stephens concurs only in the result reached with respect to count XVI. Justice Reppy dissents.

The People's summary of the direct evidence of a conspiracy with respect to the walkouts is as follows: "In October, 1967 at a joint UMAS (United Mexican American Students) and MASA (Mexican American Students Association) [meeting] petitioner Castro said that the only way to impress the kids and the Board of Education was to get the kids to walk out.

"In January or February petitioner Castro had informed the UCLA Chapter of UMAS that high school students were talking about walking out. UMAS passed a motion assuming responsibility as monitors to protect the high school students. Then there were several meetings with petitioner Castro about proposals to be submitted to the Board of Education and the walkouts. Petitioners Risco, Razo and Esparza and possibly Munoz attended some of these meetings. Signs were made sometime in February for use during the walkouts. . . ."

In addition there was offered, against Petitioner Castro only, a radio broadcast he made on May 14, 1968. The People's summary of the broadcast is as follows: ". . . Castro outlined the history of the walkouts and indicated that he had asked college students to assist by making signs and monitoring the walkouts. Petitioner Castro received help from California State, U.C.L.A. and Valley State. East L.A. College would not endorse the program. An unexpected walkout at Wilson prematurely triggered one at Garfield. Petitioner Castro then advised that the other two schools would have to have a walkout in order to show unity to the Board of Education. He explained that the Lincoln walkout was called for 10:00 and 12:00 was set for Roosevelt. He explained how well the walkout which led to Hazard Park was supervised by the College and high school monitors.

"Petitioner Castro indicated that the kids were angry because the first wave of walkouts had some defects. So the planning for further walkouts began. Intelligence reports about Thursday's walkouts, availability of signs and the weather were considered. It was planned that all four schools would walk out about 9:00 a.m. and the students would meet in Hazard Park.

He described the plans for Garfield, Roosevelt and Lincoln High Schools and analyzed what hapened at Belmont."

It is thus apparent that the People do not even claim direct proof that the walkouts, as planned, were to involve criminal disturbances of the peace. Further, it is evident that there is no direct proof that any of petitioners, except Castro, Risco, Razo, Esparza and possibly Munoz, were directly proved to have been parties to the planning of the walkouts. What the People do claim, in essence, is:

1. That other petitioners were circumstantially proved to have been participants in the planning of the walkouts by their presence and actions at the walkout sites, whether or not they behaved illegally; and

2. That the illegal nature of the plan may be inferred from the readiness with which some of those who were directly or circumstantially proved to have been planners violated the law.

I do not quarrel with the proposition that the application of conventional methods of evaluating proof in conspiracy cases supports the People's position.[7] I believe, however, that where the conspirators are admittedly engaged in the exercise of fundamental First Amendment rights, stricter standards of proof are called for and that proof of the illegal nature of the conspiracy may not rest entirely on the type of circumstantial evidence relied on here.

There can be no question that fundamentally the demonstrations, for that is what the walkouts were, were designed to publicize grievances, real or fancied. Although undoubtedly some hell was raised by some of the participants, hell-raising as such was not the objective. Though not entitled to all the protections of "pure speech," a demonstration is a legitimate exercise of First Amendment rights. (*Gregory* v. *Chicago,* 394 U.S. 111, 112 [22 L.Ed.2d 134, 136, 89 S.Ct. 946]; *Shuttlesworth* v. *Birmingham,* 394 U.S. 147 [22 L.Ed.2d 162, 89 S.Ct. 935]; *Edwards* v. *South Carolina,* 372 U.S. 229 [9 L.Ed.2d 697, 83 S.Ct. 680].)[8] This does not, of course,

---

[7] Justice Stephens has authorized me to state that the reason he concurs in the result with respect to count XVI is that he differs with me on this particular point.

[8] ". . . The right to petition for the redress of grievances has an ancient history [footnote omitted] and is not limited to writing a letter or sending a telegram to a congressman; it is not confined to appearing before the local city council, or writing letters to the President or Governor or Mayor. See *N.A.A.C.P.* v. *Button,* 371 U.S. 415, 429-431 [9 L.Ed.2d 405, 415-417, 83 S.Ct. 328]. Conventional methods of petitioning may be, and often have been, shut off to large groups of our citizens. Legislators may turn deaf ears; formal complaints may be routed endlessly through a bureaucratic maze; courts may let the wheels of justice grind very slowly. Those who do not control television and radio, those who cannot afford to advertise in newspapers or circulate elaborate pamphlets may have only a more limited type of access to public officials.

clothe petitioners with immunity from prosecution for violations of laws which the state may legitimately enforce, even against those who are exercising such rights. (*Cox* v. *Louisiana,* 379 U.S. 536, 558 [13 L.Ed.2d 471, 486, 85 S.Ct. 453].) Further, the Constitution speaks of the right to assemble peacefully. There is no right to riot. (*Adderly* v. *Florida,* 385 U.S. 39, 47 [17 L.Ed.2d 149, 155, 87 S.Ct. 242]; *Cox* v. *Louisiana,* 379 U.S. 536, 554-555 [13 L.Ed.2d 471, 483-484, 85 S.Ct. 453]; *Cox* v. *Louisiana,* 379 U.S. 559, 563-564 [13 L.Ed.2d 487, 491-492, 85 S.Ct. 476]; *Cantwell* v. *Connecticut,* 310 U.S. 296, 307-308 [84 L.Ed. 1213, 1219-1220, 60 S.Ct. 900, 128 A.L.R. 1352]; *People* v. *Davis,* 68 Cal.2d 481, 486 [67 Cal. Rptr. 547, 439 P.2d 651]; *In re Hoffman,* 67 Cal.2d 845, 849 [64 Cal. Rptr. 97, 434 P.2d 353], cf. *In re Bushman,* 1 Cal.3d 767, 773-774 [83 Cal.Rptr. 375, 463 P.2d 727].) However, since we are dealing with First Amendment rights, "[b]road prophylactic rules . . . are suspect" and "[p]recision of regulation must be the touchstone in an area so closely touching our most precious freedoms." (*N.A.A.C.P.* v. *Button,* 371 U.S. 415, 438 [9 L.Ed.2d 405, 421, 83 S.Ct. 328]; see also *Interstate Circuit* v. *Dallas,* 390 U.S. 676, 682 [20 L.Ed.2d 225, 230, 88 S.Ct. 1298]; *Ashton* v. *Kentucky,* 384 U.S. 195 [16 L.Ed.2d 469, 86 S.Ct. 1407]; *Cantwell* v. *Connecticut,* 310 U.S. 296, 307 [84 L.Ed. 1213, 1219, 60 S.Ct. 900, 128 A.L.R. 1352]; *Burton* v. *Municipal Court,* 68 Cal.2d 684, 691 [68 Cal. Rptr. 721, 441 P.2d 281]; *In re Berry,* 68 Cal.2d 137, 155 [65 Cal.Rptr. 273, 436 P.2d 273]; *In re Bell,* 19 Cal.2d 488, 496-497 [122 P.2d 22].) "Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narow specificity." (*N.A.A.C.P.* v. *Button, supra,* 371 U.S. at p. 433 [9 L.Ed.2d at p. 418].) Standards laid down must be in "terms susceptible of objective measurement." (*Cramp* v. *Board of Public Instruction,* 368 U.S. 278, 286 [7 L.Ed.2d 285, 291, 82 S.Ct. 275].) Finally and, in this particular case, most vitally, the regulation must not be of such a nature as to frighten those coming within its sweep into limiting "their behavior to that which is unquestionably safe." (*Keyishian* v. *Board of Regents of New York,* 385 U.S. 589, 609 [17 L.Ed.2d 629, 644, 87 S.Ct. 675]; see also *Dombrowski* v. *Pfister,* 380 U.S. 479, 486 [14 L.Ed.2d 22, 28, 85 S.Ct. 1116]; *Shelton* v. *Tucker,* 364 U.S. 479, 487 [5 L.Ed.2d 231, 236, 81 S.Ct. 247].)

As our own Supreme Court said quite recently in *In re Kay,* 1 Cal.3d 930, 941 [83 Cal.Rptr. 686, 464 P.2d 142]: "We recognize, of course, that because 'the "threat of sanctions may deter almost as potently as the application of sanctions" ' (*Burton* v. *Municipal Court* (1968) 68 Cal.2d 684,

. . . ." (*Adderly* v. *Florida,* 385 U.S. 39, 50-51 [17 L.Ed.2d 149, 157-158, 87 S.Ct. 242] [dissenting opinion]. See also *In re Kay,* 1 Cal.3d 930, 939-940, fn. 6 [83 Cal.Rptr. 686, 464 P.2d 142].)

691 [68 Cal.Rptr. 721, 441 P.2d 281]), 'constitutionally permissible restrictions upon the exercise of First Amendment rights . . . must be drawn with a narrow specificity calculated to prevent repression of expressive activities as to which restriction is constitutionally forbidden.' (*In re Berry* (1968) 68 Cal.2d 137, 155 [65 Cal.Rptr. 273, 436 P.2d 273]; see, e.g., *Dombrowski* v. *Pfister* (1965) 380 U.S. 479, 486-487 [14 L.Ed.2d 22, 28-29, 85 S.Ct. 1116]; *NAACP* v. *Button* (1963) 371 U.S. 415, 432-433 [9 L.Ed.2d 405, 417-418, 83 S.Ct. 328].)"

Finally, before discussing the effect of this prosecution on the exercise of rights guaranteed by the First Amendment, it must be noted that it is immaterial that the rule of circumstantial evidence which, in my view, vitiates this prosecution, is quite universally applied in cases having no First Amendment overtones. Given the proper setting, no rule can escape First Amendment scrutiny by bearing an innocuous label. In *New York Times Co.*, v. *Sullivan,* 376 U.S. 254, 269 [11 L.Ed.2d 686, 700, 84 S.Ct. 710], the Supreme Court said: ". . . [W]e are compelled by neither precedent nor policy to give any more weight to the epithet 'libel' than we have to other 'mere labels' of state law. *NAACP* v. *Button,* 371 U.S. 415, 429 [9 L.Ed.2d 405, 415, 83 S.Ct. 328]. Like insurrection, [footnote omitted] contempt, [footnote omitted] advocacy of unlawful acts, [footnote omitted] breach of the peace, [footnote omitted] obscenity, [footnote omitted] solicitation of legal business, [footnote omitted] and the various other formulae for the repression of expression that have been challenged in this Court, libel can claim no talismanic immunity from constitutional limitations. It must be measured by standards that satisfy the First Amendment."

A remarkable example of how the First Amendment can reach minutiae of rules relating to the proof of criminal conduct where such rules clash with protected constitutional rights, is afforded by the relatively recent decision in *United States* v. *Spock,* 416 F.2d 165.

In *Spock* it was the theory of the Government that the four defendants had conspired to " 'counsel, aid and abet diverse Selective Service registrants to . . . neglect, fail, refuse and evade service in the armed forces of the United States and all other duties required of registrants under the Universal Military Training and Service Act . . . and the rules, regulations and directions duly made pursuant to said Act . . . to . . . fail and refuse to have in their personal possession at all times their registration certificates [and] . . . valid notices of classification [footnote omitted] [and conspired to] . . . unlawfully, willfully, and knowingly hinder and interfere, by any means, with the administration of the Universal Military Training and Service Act.' " (416 F.2d at p. 168.) On appeal from the de-

fendants' conviction the court held that the ultimate objective of the conspiracy—expression of opposition to the war in Vietnam and to the draft—was legal, but that the means of intermediate objectives encompassed both legal and illegal activity. Relying principally on *Scales* v. *United States,* 367 U.S. 203 [6 L.Ed.2d 782, 81 S.Ct. 1469], and *Noto* v. *United States,* 367 U.S. 290 [6 L.Ed.2d 836, 81 S.Ct. 1517], the court held that the criminal intent of each defendant had to be judged *strictissimi juris,* lest a defendant who was merely in sympathy with the legitimate aims of the conspiracy, but who did not intend to accomplish such aims by resort to violence, might be convicted.

At the trial the Government had introduced numerous statements by third parties, claimed to be coconspirators. Such practice is, of course, standard procedure in conspiracy trials. (*Paoli* v. *United States,* 352 U.S. 232, 236-237 [1 L.Ed.2d 278, 282-283, 77 S.Ct. 294]; *Carbo* v. *United States,* 314 F.2d 718, 737; *People* v. *Brawley,* 1 Cal.3d 277, 290-291 [82 Cal.Rptr. 161, 461 P.2d 361]; Evid. Code, § 1223.) This was held to be improper. "The specific intent of one defendant in a case such as this is not ascertained by reference to the conduct or statements of another even though he has knowledge thereof. Cf. United States v. Silverman, 2 Cir., 1957, 248 F.2d 671; Enfield v. United States, 8 Cir., 1919, 261 F. 141, 143-144. *The metastatic rules of ordinary conspiracy are at direct variance with the principle of* strictissimi juris." (416 F.2d at p. 173. Italics added.)

The significance of *Spock* to this case is evident. There it was the rule that the First Amendment forbids punishment of persons who are knowing members of a political organization which seeks to achieve its objectives by legal as well as illegal means, as long as they do not share its unlawful purpose and do not participate in its unlawful activities, which forbade the application of a well established exception to the hearsay rule. (*United States* v. *Robel,* 389 U.S. 258, 262 [19 L.Ed.2d 508, 513, 88 S.Ct. 419]; *Keyishian* v. *Board of Regents of New York,* 385 U.S. 589, 606-608 [17 L.Ed.2d 629, 642-644, 87 S.Ct. 675]; *Elfbrandt* v. *Russell,* 384 U.S. 11, 17 [16 L.Ed.2d 321, 325, 86 S.Ct. 1238]; *Aptheker* v. *Secretary of State,* 378 U.S. 500, 511 [12 L.Ed.2d 992, 1000, 84 S.Ct. 1659]; *Cramp* v. *Board of Public Instruction,* 368 U.S. 278, 286 [7 L.Ed.2d 285, 291, 82 S.Ct. 275]; *Scales* v. *United States,* 367 U.S. 203, 229-230 [6 L.Ed.2d 782, 801-802, 81 S.Ct. 1469]; *Noto* v. *United States,* 367 U.S. 290, 297-300 [6 L.Ed.2d 836, 841-843, 81 S.Ct. 1517]; cf. *Whitehill* v. *Elkins,* 389 U.S. 54 [19 L.Ed.2d 228, 88 S.Ct. 184]; *Baggett* v. *Bullitt,* 377 U.S. 360 [12 L.Ed.2d 377, 84 S.Ct. 1316]; *Shelton* v. *Tucker,* 364 U.S. 479 [5 L.Ed.2d 231, 81 S.Ct. 247].) Here it is slavish adherence to a rule of circumstantial evidence, developed in an altogether different criminal setting, which would violate the precept

that any law which unnecessarily "chills" the exercise of free speech, must fall.

The rule applicable in ordinary conspiracy cases, is well known. It was recently summarized as follows: "The elements of conspiracy are (1) an agreement; (2) specific intent; (3) unlawful objective; and (4) overt act. (*People* v. *Aday,* 226 Cal.App.2d 520, 533 [38 Cal.Rptr. 199]; 1 Witkin, Cal. Crimes (1963) p. 99.) The existence of an agreement may be shown by circumstantial evidence. (*Bompensiero* v. *Superior Court,* 44 Cal.2d 178, 184 [281 P.2d 250]; *People* v. *Olf,* 195 Cal.App.2d 97, 107 [15 Cal.Rptr. 390]; *People* v. *Massey,* 151 Cal.App.2d 623, 651 [312 P.2d 365].) It is not necessary to show that the parties met and actually agreed to undertake the performance of an unlawful act or that they had previously arranged a detailed plan for its execution. (*People* v. *Massey, supra,* p. 651.) *The assents of the parties may be inferred from the nature of the act done, relationship of the parties, interests of the alleged conspirators, and other circumstances.* (*Bompensiero* v. *Superior Court, supra,* p. 184; *People* v. *Aday, supra,* p. 534; *People* v. *Massey, supra,* p. 652.)" (*People* v. *Lynam,* 261 Cal.App.2d 490, 502 [68 Cal.Rptr. 202]. Italics added.) The justification for the rule is said to derive from the secrecy which attends the formation of most conspiracies. (*Lorenson* v. *Superior Court,* 35 Cal.2d 49, 57-58 [216 P.2d 859]; *People* v. *Hobson,* 255 Cal.App.2d 557, 561-562 [63 Cal.Rptr. 320]; cf. *Grunewald* v. *United States,* 353 U.S. 391, 402 [1 L.Ed.2d 931, 942, 77 S.Ct. 963].) Needless to say such circumstantial evidence is often open to interpretation quite consistent with innocence.[9] In the ordinary criminal case that is no reason for not giving such circumstantial evidence its logical probative value. A just result of a criminal prosecution often depends on a jury's correct choice between conflicting inferences. ". . . [T]he law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree. If his judgment is wrong, not only may he incur a fine or a short imprisonment, as here; he may incur the penalty of death. . . ." (*Nash* v. *United States,* 229 U.S. 373, 377 [57 L.Ed. 1232, 1235, 33 S.Ct. 780].)

Yet, what is permissible when ordinary criminal conduct is involved, frequently comes to grief when tested against the First Amendment. The entire burden of a long series of recent cases interpreting that amendment is, very simply, that any rule of law which unnecessarily discourages the exercise of

---

[9]For example in *People* v. *Osslo,* 50 Cal.2d 75 [323 P.2d 397], the circumstantial evidence was found by the majority to be more than ample to prove a conspiracy, while the three dissenting justices felt that there was "not even a suggestion that there was an agreement between the defendants that any of them would commit a crime. . . ." (*50 Cal.2d at p. 107.)

free speech by making it dangerous to engage in certain constitutionally protected activities, must fall.[10]

The clearest case exemplifying this approach is *Smith* v. *California,* 361 U.S. 147 [4 L.Ed.2d 205, 80 S.Ct. 215]. Smith had been convicted under a Los Angeles ordinance which made it a crime for a bookseller to possess obscene books. *Scienter* was no element of the offense. The appellate department of the superior court affirmed. (*People* v. *Smith,* 161 Cal.App.2d Supp. 860 [327 P.2d 636].) It said: "Until one of our supreme courts declares otherwise, we are of the opinion that a bookseller may be constitutionally prohibited from possessing or keeping an obscene book in his store and convicted of doing so even though it is not shown he knows its obscene character, nor that he intends its sale. He may not, with impunity, adopt as his rule of conduct: 'Where ignorance is bliss, 'Tis folly to be wise.' " (161 Cal.App.2d at p. 866.) The court relied on the constitutionality of statutes which make it criminal to deal, however innocently, in adulterated food. (See *People* v. *Schwartz,* 28 Cal.App.2d 775 [70 P.2d 1017]; cf. *People* v. *Vogel,* 46 Cal.2d 798, 801, fn. 1 [299 P.2d 850].)

Logically the California court's position was unimpeachable. Like adulterated food, obscenity is not protected by the First Amendment. (*Roth* v. *United States,* 354 U.S. 476, 485-486 [1 L.Ed.2d 1498, 1507-1508, 77 S.Ct. 1304].) Filthy books and filthy food are, therefore, in the same constitutional cold.

It was not that simple. The Supreme Court's reversal of Smith's conviction rested on the ground that the effect of the ordinance, as interpreted, was that constitutionally protected material would become unavailable to the public because booksellers would not dare to sell any books except those they personally knew not to be obscene. Because of the impossibility of becoming acquainted with more than a small percentage of all published material, constitutionally protected writings would thus be withdrawn from the market. "The bookseller's self-censorship, compelled by the State, would be a censorship affecting the whole public, hardly less virulent for being privately administered. Through it, the distribution of all books, both obscene and not obscene, would be impeded." (*Smith* v. *California,* 361 U.S. 147, 154 [4 L.Ed.2d 205, 211, 80 S.Ct. 215].)

---

[10]"Another major conceptual contribution of the Warren Court has been development of the idea of self-censorship. A regulation of communication may run afoul of the Constitution not because it is aimed directly at free speech, but because in operation it may trigger a set of behavioral consequences which amount in effect to people censoring themselves in order to avoid trouble with the law. . . ." (Kalven, *"Uninhibited, Robust and Wide-Open"—a Note on Free Speech and the Warren Court,* 67 Mich.L.Rev. 289, 297.)

*Smith* was much relied on in *New York Times Co.* v. *Sullivan,* 376 U.S. 254, 278-279 [11 L.Ed.2d 686, 705-706, 84 S.Ct. 710, 95 A.L.R.2d 686]. After quoting from the passage excerpted above, the court showed its relevance to the problem before it—the amount of freedom for untrue, defamatory statements about public officials which the First Amendment compels the states to absorb into their libel laws. "A rule compelling the critic of official conduct to guarantee the truth of all his factual assertions—and to do so on pain of libel judgments virtually unlimited in amount—leads to a comparable 'self-censorship.' Allowance of the defense of truth, with the burden of proving it on the defendant, does not mean that only false speech will be deterred. Even courts accepting this defense as an adequate safeguard have recognized the difficulties of adducing legal proofs that the alleged libel was true in all its factual particulars. See, e.g., *Post Publishing Co.* v. *Hallam,* 59 F. 530, 540 (CA6th Cir. 1893); see also Noel, Defamation of Public Officers and Candidates, 49 Col L Rev 875, 892 (1949). *Under such a rule, would-be critics of official conduct may be deterred from voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt whether it can be proved in court or fear of the expense of having to do so. They tend to make only statements which 'steer far wider of the unlawful zone.' Speiser v. Randall, supra,* 357 U.S. at 526 [2 L.Ed.2d at 1473]. *The rule thus dampens the vigor and limits the variety of public debate. It is inconsistent with the First and Fourteenth Amendments."* (*New York Times Co.* v. *Sullivan,* 376 U.S. 254, 276 [11 L.Ed.2d 686, 706, 84 S.Ct. 710, 95 A.L.R.2d 1412]. Italics added.)

The court held that nothing short of "actual malice" as a limitation on the right to criticize a public official would give the exercise of First Amendment rights the "breathing space" that it needed to survive.

The same fear of self-censorship where "discussion of public affairs is concerned" led to a constitutionally mandated redefinition of the concept of malice in criminal defamation statutes (*Garrison* v. *Louisiana,* 379 U.S. 64 [13 L.Ed.2d 125, 85 S.Ct. 209]) and to the rule of *Time* v. *Hill,* 385 U.S. 374 [17 L.Ed.2d 456, 87 S.Ct. 534], that a state could not base liability in a so-called "false light" privacy case[11] on mere negligence. *"Fear of large verdicts in damage suits for innocent or merely negligent misstatement, even fear of the expense involved in their defense, must inevitably cause publishers to 'steer . . . wider of the unlawful zone,' New York Times Co.* v. *Sullivan,* 376 U.S., at 279 [11 L.Ed.2d at 706, 95 A.L.R.2d 1412]; see also *Speiser* v. *Randall,* 357 U.S. 513, 526 [2 L.Ed.2d 1460, 1472, 78 S.Ct. 1332]; *Smith* v. *California,* 361 U.S. 147, 153-154 [4

---

[11]See Prosser, *Privacy,* 48 Cal.L.Rev. 383, 398-401.

L.Ed.2d 205, 211, 80 S.Ct. 215]; *and thus 'create the danger that the legitimate utterance will be penalized.' Speiser* v. *Randall, supra,* 357 U.S. at 526 [2 L.Ed.2d at 1473]." (*Time* v. *Hill,* 385 U.S. 374, at p. 389 [17 L.Ed.2d 456, 468, 87 S.Ct. 534]. Italics added.)

The theme is plain: it does not matter that the conduct which the state purports to penalize, criminally or civilly, is not itself what the First Amendment protects—it is the effect of such sanctions on the Constitution's promises which will be scrutinized.[12] Nothing in the Constitution protects—as such—the freedom to possess obscene books for sale, with or without knowledge of their contents. (Cf. *Stanley* v. *Georgia,* 394 U.S. 557 [22 L.Ed.2d 542, 89 S.Ct. 1243]; *In re Klor,* 64 Cal.2d 816, 820-821 [51 Cal.Rptr. 903, 415 P.2d 791].) Yet we cannot penalize innocent possession for sale because a value which the Constitution does protect may become the loser. Nor, one may suppose, was it enthusiasm for the right to utter negligent falsehoods about one's political enemies which prompted the adoption of the First Amendment. Yet we immunize such right in order to preserve "uninhibited, robust, and wide-open" debate on public issues. (*New York Times Co.* v. *Sullivan, supra,* 376 U.S. at pp. 270, 279, fn. 19 [11 L.Ed.2d 700, 706].) "Without those peripheral rights the specific rights would be less secure." (*Griswold* v. *Connecticut,* 381 U.S. 479, 483 [14 L.Ed.2d 510, 514, 85 S.Ct. 1678].)[13]

[12]Threats to the free exercise of First Amendment rights work miracles in many areas of the law. Thus in *Wolff* v. *Selective Service Local Board No. 16,* 372 F.2d 817, the general rule that federal courts would not review Selective Service classification orders except in criminal prosecutions or in habeas corpus proceedings was held to be inapplicable because the reclassification of plaintiffs had resulted from their participation in a demonstration to protest American involvement in Viet Nam. ". . . . The effect of the reclassification itself is immediately to curtail the exercise of First Amendment rights. . . ." (372 F.2d at p. 823.) Similarly in *National Student Association* v. *Hershey,* 412 F.2d 1103, the "chilling effect" of a directive from General Hershey to all members of the Selective Service System created a "case or controversy" within the meaning of article III of the Constitution, where otherwise there would have been none. The directive, broadly speaking, authorized the reclassification of registrants who were found to have participated in illegal demonstrations. More substantively, the "naked title" of a shop keeper over a privately owned sidewalk, does not deprive "members of the public of their rights to exercise First Amendment privileges" on such privately owned property. (*In re Lane,* 71 Cal.2d 872, 878 [79 Cal.Rptr. 729, 457 P.2d 561].)

[13]The "specific guarantees in the Bill of Rights have penumbras, formed by emanations from those guarantees that help give them life and substance." (*Griswold* v. *Connecticut, supra,* 381 U.S. at p. 484 [14 L.Ed.2d at p. 514].) The Supreme Court has used a variety of metaphors to express the thought that free speech must be "overprotected in order to assure that it is not underprotected." Kalven, *The New York Times Case: A Note on "The Central Meaning Of The First Amendment,"* 1964 Sup.Ct. Rev. 191, 213.) Thus in *Bantam Books* v. *Sullivan,* 372 U.S. 58, 66 [9 L.Ed.2d 584, 591, 83 S.Ct. 631], it speaks of "the larger principle that the freedoms of expression must be ringed about with adequate *bulwarks.*" (Italics added.)

The peripheral rights recognized by the Supreme Court are not merely substantive. Thus where the object of a search warrant is the seizure of allegedly obscene materials, a procedure which would satisfy the seizure of gambling paraphernalia or contraband liquor is constitutionally defective (*Marcus* v. *Search Warrant,* 367 U.S. 717, 731 [6 L.Ed.2d 1127, 1135-1136, 81 S.Ct. 1308]; see also *A Quantity of Books* v. *Kansas,* 378 U.S. 205, 211-212 [12 L.Ed.2d 809, 813-814, 84 S.Ct. 1723]); ex parte restraining orders, for which "[t]here is a place in our jurisprudence," have "no place within the area of basic freedoms guaranteed by the First Amendment . . ." (*Carroll* v. *Commissioners of Princess Anne,* 393 U.S. 175, 180 [21 L.Ed.2d 325, 330-331, 89 S.Ct. 347]); the power to arrest for exhibiting an obscene film (Pen. Code, § 311.2) does not carry with it the usual incidental power to seize the offending motion picture (*Flack* v. *Municipal Court,* 66 Cal.2d 981, 990-991 [59 Cal.Rptr. 872, 429 P.2d 192]); the would-be vendor of an arguably obscene book need not await criminal proceedings before being entitled to a judicial determination of the nature of the work: to prevent self-censorship, we permit him to seek guidance in an action for declaratory relief (*Zeitlin* v. *Arnebergh,* 59 Cal.2d 901, 906-907 [31 Cal.Rptr. 800, 383 P.2d 152, 10 A.L.R.3d 707]); and a scheme for the advance censorship of motion pictures escapes constitutional condemnation only if, among other things, it provides that the burden of proving unprotected expression rests on the censor (*Freedman* v. *Maryland,* 380 U.S. 51, 58 [13 L.Ed.2d 649, 654, 85 S.Ct. 734]). And so it goes: where the separation of legitimate from illegitimate speech is concerned, the Constitution calls for "sensitive tools." (*Speiser* v. *Randall,* 357 U.S. 513, 525 [2 L.Ed.2d 1460, 1472, 78 S.Ct. 1332].)

In *Speiser* v. *Randall, supra,* the procedural device of allocating the burden of proof on a particular party—generally not a matter of constitutional concern—vitiated a scheme for withholding tax exemptions from persons who advocated the overthrow of the government by force. "The vice of the present procedure is that, where particular speech falls close to the line separating the lawful and the unlawful, *the possibility of mistaken factfinding—inherent in all litigation—*will create the danger that the legitimate utterance will be penalized . . . *It can only result in a deterrence of speech which the Constitution makes free.* 'It is apparent that a constitutional prohibition cannot be transgressed indirectly by the creation of a statutory presumption any more than it can be violated by direct enactment. The power to create presumptions is not a means of escape from constitutional restrictions.' *Bailey* v. *Alabama,* 219 U.S. 219, 239 [55 L.Ed. 191, 200, 31 S.Ct. 145]." (*Speiser* v. *Randall, supra,* 357 U.S. 513 at p. 526 [2 L.Ed.2d 1460 at p. 1473]. Italics added.)

It is thus apparent that in the First Amendment area the decisions of both high tribunals by which courts such as ours are bound, compel the application of substantive and procedural criteria far more exacting than any specifically enjoined on us by pertinent provisions of the Bill of Rights. If a state law, as enforced by applicable state procedures, does not show "the necessary sensitivity to freedom of expression" (*Freedman* v. *Maryland, supra,* 380 U.S. 51, 58 [13 L.Ed.2d 649, 653]), it must fall. (See Monaghan, *First Amendment "Due Process,"* 83 Harv.L.Rev. 518.)[14]

Do we show that necessary sensitivity when, by the application of a rule of circumstantial evidence, we use the general conspiracy statute in a way which makes the organizers of a constitutionally protected demonstration liable to be convicted as felons on charges based on evidence derived solely from the conduct of the demonstrators, should a jury feel inclined to draw the inferences pointing to guilt rather than those that support innocence? To be sure, in the case at bar, the inference that the demonstrations, as planned, involved illegal conduct, rests as to several petitioners on their own illegal acts at the sites of the walkouts. The fact remains, however, that—in theory at least—this prosecution is directed at the agreement to demonstrate, not at the demonstrations themselves. The risk of erroneous interpretation of circumstantial evidence relating to conduct occurring long after the crime charged has been completed is just as great, as to any particular accused, whether the conduct subject to misinterpretation is his own or that of another demonstrator. The "possibility of mistaken fact-finding" seems far greater here than in the context of *Speiser.* A fortiori the prosecution should fail.

It is not necessary to dwell at length on the potential for unfairness inherent in every conspiracy trial. That subject has been thoroughly treated elsewhere. (*Krulewitch* v. *United States,* 336 U.S. 440, 445 [93 L.Ed. 790, 795, 69 S.Ct. 716] (concurring opinion by Jackson, J.); *Grunewald* v. *United States,* 353 U.S. 391, 404-405 [1 L.Ed.2d 931, 943-944, 77 S.Ct. 963]; *United States* v. *Falcone,* 109 F.2d 579, 581; O'Brian, *Loyalty Tests and Guilt by Association,* 61 Harv.L. Rev. 592, 600; King, *The Control of Organized Crime in America,* 4 Stan.L.Rev. 52, 60; cf. *People* v.

[14]It is Professor Monaghan's thesis that, in the First Amendment area, the "[Supreme] Court has placed little reliance upon the due process requirements of the fifth and fourteenth amendments, but instead has turned directly to the first amendment as the source of the rules. . . . It has, for example, sharply circumscribed the power of state courts to enjoin arguably protected mass demonstrations, [footnote omitted] has shown an increasing reluctance to restrict the availability of prospective relief in first amendment cases, [footnote omitted] and has even held that the burden of proof rules in tax litigation are of constitutional magnitude when first amendment interests are at stake. . . ." (83 Harv.L.Rev. 518-519.)

*Bartlett,* 153 Cal.App.2d 574, 579 [314 P.2d 995].) It is sufficient to summarize the possible fonts of injustice:

(1) The possibility of a trial in a jurisdiction in which a particular defendant may never have set foot, as long as a coconspirator's overt act was done in that jurisdiction;[15]

(2) The automatic[16] application of the exception to the hearsay rule which admits against him declarations of a coconspirator "in furtherance of the object" of the conspiracy made before or while the accused was participating in it. Such declarations are not supposed to be admitted until after independent proof of the conspiracy, but as Justice Jackson points out: "[T]he order of proof of so sprawling a charge is difficult for a judge to control. As a practical matter, the accused often is confronted with a hodgepodge of acts and statements by others which he may never have authorized or intended or even known about, but which help to persuade the jury of existence of the conspiracy itself. In other words, a conspiracy often is proved by evidence that is admissible only upon assumption that conspiracy existed. The naive assumption that prejudicial effects can be overcome by instructions to the jury, cf. *Blumenthal* v. *United States,* 332 U.S. 539, 559, all practicing lawyers know to be unmitigated fiction. . . ." 336 U.S. at p. 453 [93 L.Ed. at p. 799].[17]

(3) The psychological reality that in a trial against a number of conspirators, a weak case against one defendant will be strengthened by a mass of evidence relevant only to his co-defendants. ". . . There generally will be evidence of wrongdoing by somebody. It is difficult for the individual to make his own case stand on its own merits in the minds of jurors who are ready to believe that birds of a feather are flocked together. If he is silent,

---

[15]The last paragraph of section 182 of the Penal Code reads as follows: "All cases of conspiracy may be prosecuted and tried in the superior court of any county in which any overt act tending to effect such conspiracy shall be done."

[16]Although section 1223 of the Evidence Code, which embodies this exception, is applicable even if the crime charged is not conspiracy (*People* v. *Morales,* 263 Cal.App.2d 368, 374 [69 Cal.Rptr. 402]), it may or may not come into play, depending on whether or not a conspiracy is incidentally proved. Where, however, the very charge is conspiracy, part of the foundation for the application of section 1223 must necessarily be proved, if the defendant is to suffer a conviction.

[17]In recognition of the fact that in many conspiracy trials it is impossible, as a practical matter, to demand prima facie proof of the conspiracy before evidence of coconspirators' extrajudicial statements is received, section 1223 of the Evidence Code expressly permits the trial court, in its discretion, to allow such declarations to be received before independent proof of the conspiracy has been introduced. The California practice, enshrined in sections 403 and 1223 of the Evidence Code, does not even require the trial court to make its own fact finding of the existence of a conspiracy, before the jury is permitted to hear the "hodgepodge of acts and statements by others." See *People* v. *Brawley,* 1 Cal.3d 277, 290-291 [82 Cal.Rptr. 161, 461 P.2d 361]; cf. *Carbo* v. *United States,* 314 F.2d 718, 737.

he is taken to admit it and if, as often happens, co-defendants can be prodded into accusing or contradicting each other, they convict each other. There are many practical difficulties in defending against a charge of conspiracy which I will not enumerate." (336 U.S. at p. 454 [93 L.Ed. at p. 800].)

(4) The undeniable fact that in spite of occasional protests to the contrary *(People* v. *Rodriguez,* 37 Cal.App.2d 290, 294 [99 P.2d 363]), the courts have been extremely liberal in assessing the sufficiency of the evidence, particularly with respect to the underlying conspiratorial agreement. *(Developments in the Law—Criminal Conspiracy,* 72 Harv.L.Rev. 920, 984.)

(5) The stark fact of vicarious criminal liability for acts of coconspirators "within the reasonable and probable consequences of the common unlawful design." *(People* v. *Kauffman,* 152 Cal. 331, 335 [92 P. 861]; see also *People* v. *Smith,* 63 Cal.2d 779, 793-794 [48 Cal.Rptr. 382, 409 P.2d 222].) These may be acts, which, as such, may never have been contemplated by a particular member of the conspiracy.[18]

Just how insensitive a tool the conventional conspiracy approach can be in a case such as the one at bar is illustrated by one of the People's own arguments in this case. Answering petitioners' point that any disturbances during the walkouts were spontaneous and unanticipated, which, petitioners urge, is proved by the fact that they recruited monitors from various sympathetic groups at local colleges, the People argue: "12,300 students were enrolled at the four high schools. Even discounting students who would be normally absent on any given day, monitoring the students would be a tremendous job. Inherent in such a large scale operation was the certainty of school disruption since total success would leave the schools without students and a partial walkout would result in agitating the non-participants in order to achieve total unity.

*"To anticipate that the students would walk out silently and solemnly as if in a funeral procession rather than behave like they were at a football game would have been unrealistic. It was quite likely that anticipated student behavior was one reason for the suggestion of monitors."* (Italics added.)

This may be perfectly true, but where does it lead? Only to the conclusion that anyone who organizes a demonstration of high school students inevitably takes a chance that he may have to stand trial on a felony

---

[18]Thus if, in an idealistic belief that the end justifies the means, a coconspirator takes it upon himself to burglarize a lumber yard to steal lumber for picket signs, all members of the conspiracy are guilty of burglary.

charge the moment student misbehavior reaches misdemeanor proportions, regardless of the fact that no direct testimony proves that such misbehavior was planned.[19]

The People's argument is not illogical. The very vice of this prosecution, when measured against the dictates of the First Amendment, is that it is not. Therefore, unless one is prepared to say that anyone who organizes a demonstration by high school students assumes the risk of their misbehavior, it must be that the First Amendment prohibits conspiracy prosecutions in this area where the People's case that the demonstrations, as planned, involved illegal means, rests entirely on circumstantial evidence.

This does not mean, of course, that even if it is inevitable that high school students will violate section 415 if they demonstrate, they must be permitted to do so without fear of punishment. The state can punish them and those who aid and abet them as misdemeanants under that section, and, if the evil is thought to be sufficiently grave, the Legislature can declare the acts prohibited by section 415 to be felonies.[20] Under the law of attempts the police need not wait for crimes to be completed before they can step in; but the People's attempt to reach the evil by the "conspiracy-circumstantial evidence" route is "too blunt an instrument," (*In re Berry, supra,* 68 Cal.2d 137, 154) and not the kind of narrow, specific weapon which the First Amendment demands.

One need not, however, think only of hypothetical situations to illustrate the inhibiting effect of the conspiracy concept in this particular area. Consider the evidence adduced against the petitioner J. Patricio Sanchez:

There is no direct evidence that this petitioner participated in the planning of the demonstrations. Soon after the first one had started at Garfield High School on March 5, he arrived by automobile. He opened the trunk and distributed picket signs which, he told a Father Luce, an Episcopal priest, had been left over from another demonstration which had taken place in October 1967. He said "Gee, Father, this is great." The next day he was seen driving past Roosevelt High School where no

---

[19]Logically this argument also leads to the result that as soon as two persons have agreed to organize a demonstration by high school students and one of them has placed a telephone call for the purpose of engaging monitors, the People have a prima facie case of conspiracy.

[20]Such an approach would comply with the requirement that in the First Amendment area laws must be "couched in the narrowest terms that will accomplish the pin-pointed objective permitted by constitutional mandate and the essential needs of the public order." (*Carroll* v. *Commissioners of Princess Anne,* 393 U.S. 175, 183 [21 L.Ed.2d 325, 332, 89 S.Ct. 347].)

demonstration took place at the time, although the petitioner Vigil had previously encouraged 10 to 15 students to leave the school.

Although this seems ridiculously little evidence on which to force anyone to answer felony charges, I cannot say that under applicable conspiracy principles it is not enough. Sanchez' prompt arrival with picket signs may be interpreted as some evidence of his participation in the planning of the demonstrations. The fact that other petitioners, whose presence at the demonstration may be similarly interpreted, did violate section 415 again is some evidence that the planning did encompass the commission of that crime. Although, of course, none of these inferences are compelled and could be easily rebutted at a trial, the net effect is that a person who merely joins a demonstration started by others, with apparent foreknowledge that it was to take place, may be held to answer felony charges simply because others with similar apparent foreknowledge commit or encourage misdemeanors during the demonstration.

To be sure, as we have witnessed during the past few years, many Americans are not intimidated by the possibility of a conspiracy prosecution. One cannot open a paper without reading about demonstrations, many of which exceed the bounds of legitimate dissent. This proves nothing. It may safely be supposed that even before *Smith* v. *California, supra,* 361 U.S. 147, was decided, there were booksellers in California who were willing to take the risk of selling unread books which a court might later find to be obscene. The First Amendment, however, protects not only those who are ignorant or contemptuous of the law, or those too foolhardy to care. Our concern should rather be with those who sincerely desire to stay within the law, while fully exercising their constitutional rights.

This is the nub of the problem. Anyone even vaguely familiar with the substantive and procedural characteristics of conspiracy law must soon realize that there is no crime in our system of which—in spite of all our procedural safeguards—an innocent person can so easily be found guilty; that there is no comparable legal situation where his freedom depends so precariously on the deeds and words of others over whom he has no control, on the ability of juries to perform impossible mental gymnastics and feats of memory,[21] on the fortuitous outcome of fact-finding based on ambiguous circumstantial evidence—in short, on factors quite unrelated to the issue of actual, personal guilt. The existence of no other crime offers such rewards for limiting one's behavior to "that which is unquestionably

---

[21]In *United States* v. *Bufalino,* 285 F.2d 408, 417, the court, speaking of the problems encountered in a typical conspiracy case, says: "Courts have long indulged in the somewhat naive supposition that jurors can properly assess such evidence and determine from it the individual guilt of each of many defendants . . ."

safe." (*Keyishian* v. *Board of Regents of New York, supra,* 385 U.S. 589, 609 [17 L.Ed.2d 629, 644].) Yet when grievances are being laid before the government, when the most basic rights of a free people are being exercised, surely that is not the time when, to paraphrase Justice Cardozo, the timorous must stay at home (*Murphy* v. *Steeplechase Amusement Co.,* 250 N.Y. 479, 483 [166 N.E. 173]), simply because they have no stomach for entrusting their personal freedom and the support and well-being of their families to the uncontrollable acts of others and the chanciness of conspiracy prosecutions based on circumstantial evidence.

"When the effective exercise of First Amendment rights relating to speech is impaired by governmental regulation, a court must weigh the extent of the impairment against both the importance of the governmental interest and the substantiality of the threat which the forbidden speech or related activity poses to that interest." (*Los Angeles Teachers Union* v. *Los Angeles City Board of Education,* 71 Cal.2d 551, 556 [78 Cal.Rptr. 723, 455 P.2d 827].) No one can deny the vital interest of the People in preventing offensive and tumultuous conduct as defined in *In re Bushman, supra,* 1 Cal.3d 767, 773. I reiterate that if petitioners committed the acts disclosed to the grand jury, they should have been tried and punished for them. However, a balancing of the chilling effect of the possibility of a conspiracy prosecution based on circumstantial evidence against the constitutional imperative of an unfettered exercise of First Amendment rights, compels the conclusion that the value of the availability of that additional weapon in the arsenal of the government is outweighed by the extent of the impairment of protected freedoms.

In *Wolff* v. *Selective Service Local Board No. 16,* 372 F.2d 817, 822, the court was speaking of freedom of speech and assembly, rights which it called "the most perishable, yet the most vital to the preservation of American democracy," when it said: ". . . Historically, these preferred and paramount rights have continually come under attack from the best intentioned sources. And once the erosion of these rights is permitted to begin, it is exceedingly difficult to halt and the intervening damage may be irreparable. . . ." Who, with the People's argument quoted above in mind, would dare to step forward and organize a demonstration or parade by high school students? Or who, if he is courageous enough to do so, will increase his visibility by recruiting monitors[22] to keep order or by applying for any necessary permits? The Damoclean sword of a conspiracy

---

[22]It is interesting to note that the People use the very fact that petitioners had employed monitors as evidence of criminal intent.

charge thus actually discourages the taking of the very measures designed to prevent the evils at which this prosecution is directed.

It may be suggested that a prohibition of this prosecution on count XVI for the reason that the illegality of the conspiracy is shown only by circumstantial evidence rests on an artificial distinction between direct and circumstantial evidence unknown to the law. The suggestion would be incorrect. There are other instances where the law makes a vital distinction between direct and circumstantial evidence. One is in the United States Constitution itself which demands in article III, section 3 that no one may be convicted of treason "unless on the Testimony of two Witnesses to the same overt Act . . ." (See also Cal. Const., art. I, § 20; Pen. Code, § 1103.) In *Cramer* v. *United States,* 325 U.S. 1, 31 [89 L.Ed. 1441, 1459, 65 S.Ct. 918], the court explains that the "constitutional requirement in effect is one of direct rather than circumstantial evidence." (See also, *Kawakita* v. *United States,* 343 U.S. 717, 742 [96 L.Ed. 1249, 1267, 72 S.Ct. 950]; *Haupt* v. *United States,* 330 U.S. 631, 640 [91 L.Ed. 1145, 1153, 67 S.Ct. 874].) Then there is the general requirement that perjury be proved either by the direct testimony of two witnesses, or that of one witness plus corroboration. (7 Wigmore, Evidence (3d ed. 1940) § 2040, p. 273.)[23] It is of some significance that one of the explanations generally given for this requirement in perjury cases is that an application of the ordinary quantum of proof would make the witness stand too dangerous for honest witnesses— in other words, "chill" their willingness to come forward and make their contribution to the search for truth. (*Weiler* v. *United States,* 323 U.S. 606, 609 [89 L.Ed. 495, 498, 65 S.Ct. 548, 156 A.L.R. 496]; see also *People* v. *O'Donnell,* 132 Cal.App.2d 840, 845 [283 P.2d 714]; cf. *People* v. *Roubus,* 65 Cal.2d 218, 221-222 [53 Cal.Rptr. 281, 417 P.2d 865]; *People* v. *Di Giacomo,* 193 Cal.App.2d 688, 693 [14 Cal.Rptr. 574].)

Lastly, although in other contexts a distinction of constitutional dimensions based on whether the state proves its case by circumstantial rather than direct evidence would seem specious, it has peculiar validity in this area. It is one thing for the law to say to the prospective organizer of a peaceful demonstration that he is liable to be found a felon if a false or mistaken witness comes forward with direct evidence of a criminal agreement. Every person is constantly subject to that danger and must be content

---

[23]This requirement was in effect in California until 1969. (Pen. Code, § 1103a, as added by Stats. 1905, ch. 533.) Taking heed of prevalent criticism of the rule, it was modified by the 1969 Legislature. (Pen. Code, § 1103a, Stats. 1969, ch. 831, § 1.) The fact that our Legislature appears to favor a blurring of the distinctions between direct and circumstantial evidence in the perjury area does not affect our point, that in other areas it has continued validity. Nor is it material to the present point that section 1103a has been held to have no application except at the trial level. (*People* v. *Poe,* 265 Cal.App.2d 385, 391-392 [71 Cal.Rptr. 161].)

with the hope that the array of constitutional safeguards available to one accused of crime will prevent an unjust conviction. Even a person who is engaged in an activity protected by the First Amendment may legitimately be required to act in the expectation that confrontation and cross-examination of the false accuser will, at least, create a reasonable doubt—a probability which should to some extent, offset any pressure to practice self-censorship.[24] On the other hand, one cannot confront or cross-examine an inference drawn from circumstantial evidence. One can offer evidence which, if believed, destroys the inference, one can argue against it, one can hope that the court's cautionary instructions will cause the jury not to draw it—but that is all. If it nevertheless chooses to do so, appellate courts are powerless to do anything about it. Unquestionably where the People's case rests entirely on circumstantial evidence, the risk of an unjust conviction is greater. It is that increase in the risk which has a sufficient tendency to induce a constitutionally undesirable self-censorship, which causes the present prosecution to be too "insensitive" a tool. It must be remembered that in areas which do not touch rights protected by the First Amendment, the state has no duty to see to it that persons do not restrict their conduct to that which is "unquestionably safe." On the contrary, if fear of unjust convictions based on circumstantial evidence will cause people to conduct themselves so that they do not even give the appearance of having committed crimes, so much the better. The theory behind the First Amendment, however, is not merely permissive. If the cases cited earlier mean anything, they stand for the proposition that free speech is not just grudgingly tolerated—on the contrary, it is a national goal to be actively nurtured and encouraged.

It is for the reasons indicated that I believe this prosecution to be constitutionally invalid with respect to count XVI.[25]

---

[24] As noted at the outset, petitioners claim that the entire concept of a conspiracy prosecution in this area "chills" the exercise of First Amendment rights. As the text preceding this footnote indicates, I disagree. To take an extreme example: what conceivable constitutional right is violated if the People can prove their case by a properly authenticated sound motion picture film of a meeting where persons plan a demonstration which, as planned, is to include the commission of disturbances of the peace?

[25] I do not intend to take lengthy issue with Justice Reppy's persuasive dissent. It is appropriate, however, to indicate where we agree and where we differ. I am, of course, in entire sympathy with his views concerning the sanctity of the educational process and I think that I have sufficiently indicated my personal dislike for a method of publicizing grievances which inevitably involves a serious interference with the rights of students who do not harbor these grievances or who do not wish to air them right then, to be left alone to pursue their studies. Where Justice Reppy and I differ, is I believe, in this: granting the impropriety of the method chosen by petitioners, still the ultimate purpose of the walkouts was a legitimate exercise of First Amendment rights. Granting further, at least for the sake of argument, that there is direct evidence that the walkouts inevitably would disrupt the educational process and pos-

### Conspiracy to Disturb a Public School—Count XV

In this part of the opinion the writer is joined by Justice Reppy. Justice Stephens concurs in the result.

██ We hold that section 16701 of the Education Code is overbroad.[26]

██ "The concept of overbreadth . . . rests on principles of substantive due process which forbid the prohibition of certain individual freedoms. . . . [T]he issue is whether the language of the statute, given its normal meaning, is so broad that its sanctions may apply to conduct protected by the Constitution." (*Landry* v. *Daley*, 280 F.Supp. 938, 951.)

There is no need to cite a phalanx of United States Supreme Court authorities for the proposition that free speech is no less protected because it "disturbs." If First Amendment rights were limited to speech that pleases and tranquilizes the listener, the constitutional immunity would be un-

---

sibly involve the commission of crimes other than those prohibited by section 415, it still is the rule, I believe, that petitioners may attempt to demonstrate the constitutional infirmity of this prosecution by relying on the First Amendment rights of others who might be brought into court with hands cleaner than theirs. This exception to the usual need for "standing" is so well established in the First Amendment area that no string of citations is needed. (See authorities referred to in *Canon* v. *Justice Court*, 61 Cal.2d 446, 450 [39 Cal.Rptr. 228, 393 P.2d 428].) It would be an entirely different matter if petitioners had been charged with conspiring to violate the various laws referred to in the dissent—but they were not. Therefore, if I am right in my fundamental thesis—that the organizers of a demonstration cannot be convicted of conspiracy to violate particular laws based solely on inferences drawn from the conduct of the demonstrators—it seems to me to make no difference that these same organizers were also bent on violating other laws. I would point out, for example, that the appellants in *Speiser* v. *Randall, supra,* 357 U.S. 513 never even filed the declaration required by the California statute and thus refused to test the question whether the imposition of the burden of proof as to them was prejudicial. For all we know they were the most ultrasubversives in the state and the taxing authorities would have been able to prove it wherever the burden of proof was placed and however stringent its degree. (Cf. *In re Winship,* 397 U.S. 358, 360, fn. 2 [25 L.Ed.2d 368, 373, 90 S.Ct. 1068].) The court held that they were, nevertheless, entitled to question the constitutionality of the statutory scheme. "Accordingly, though the validity of § 19 of Art. XX of the State Constitution be conceded *arguendo, its* enforcement through procedures which place the burdens of proof and persuasion on the taxpayer is a violation of due process. It follows from this that appellants could not be required to execute the declaration as a condition for obtaining a tax exemption or as a condition for the assessor proceeding further in determining whether they were entitled to such an exemption. Since the entire statutory procedure, by placing the burden of proof on the claimants, violated the requirements of due process, appellants were not obliged to take the first step in such a procedure."

[26]We say nothing about vagueness. A similar statute withstood an attack on that ground in *State* v. *Wiggins,* 272 N.C. 147 [158 S.E.2d 37]. There, however, the statute made it illegal to *"interrupt or* disturb" any school. Although the distinction between the twin vices of vagueness and overbreadth was formerly somewhat blurred, it is now reasonably clear; ". . . Appellant's challenge is not that the statute is void for 'vagueness,' that is, that it is a statute 'which either forbids or requires the doing of an

necessary. No one objects to what he likes to hear. It is our own Supreme Court which has said: ". . . Free speech inevitably encourages conflict and often rocks the boat. Phlegmatic indeed is the individual who at some time has not recoiled at the exercise of free speech by others. Annoyance and inconvenience, however, are a small price to pay for preservation of our most cherished right. . . ." (*Wirta* v. *Alameda-Contra Costa Transit Dist.,* 68 Cal.2d 51, 62 [64 Cal.Rptr. 430, 434 P.2d 982].)

Unquestionably the walkouts involved disturbances of the schools in question which the Legislature has every right to prohibit by a narrowly drawn statute aimed specifically at the evil "within the allowable area of state control." (*Thornhill* v. *Alabama,* 310 U.S. 88, 97 [84 L.Ed. 1093, 1099, 60 S.Ct. 736].) ■ Again, however, "[b]ecause First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." (*N.A.A.C.P* v. *Button,* 371 U.S. 415, 433 [9 L.Ed.2d 405, 418, 83 S.Ct. 328].)

It is immaterial that some petitioners, at least, appear to have created disturbances against which the state has every right to protect the schools. ■ ". . . Where the statute is attacked on First Amendment grounds the court is not limited in its examination to the application of the statute involved in the particular case, but may consider other possible applications of the statute. (*Fort* v. *Civil Service Com., ante,* p. 331 [38 Cal.Rptr. 625, 392 P.2d 385]; *Thornhill* v. *Alabama,* 310 U.S. 88 [84 L.Ed. 1093, 60 S.Ct. 736]; see generally Note, *Inseparability in Application of Statutes Impairing Civil Liberties,* 61 Harv.L.Rev. 1208.)" (*Canon* v. *Justice Court,* 61 Cal.2d 446, 450 [39 Cal.Rptr. 228, 393 P.2d 428]; see also *Burton* v. *Municipal Court,* 68 Cal.2d 684, 688 [68 Cal.Rptr. 721, 441 P.2d 281]; *Bagley* v. *Washington Township Hospital Dist.* 65 Cal.2d 499, 508-509 [55 Cal.Rptr. 401, 421 P.2d 409].)

The inquiry is therefore rather simple: whether the statutory language, as narrowed by any judicial decision, encompasses conduct which is protected by the First Amendment.

---

act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application. . . .' *Connally* v. *General Construction Co.,* 269 U.S. 385, 391 [70 L.Ed. 322, 328, 46 S.Ct. 126]. [Footnote omitted.] Rather his constitutional attack is that the statute, although lacking neither clarity nor precision, is void for 'overbreadth,' that is, that it offends the constitutional principle that 'a governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms.' . . ." (*Zwickler* v. *Koots,* 389 U.S. 241, 249-250 [19 L.Ed.2d 444, 451, 88 S.Ct. 391]; see also *In re Berry,* 68 Cal.2d 137, 156, fn. 15 [65 Cal.Rptr. 273, 436 P.2d 273].)

Before demonstrating that this question must be answered affirmatively, it is well to note that there do not appear to be any decisions which have put a narrowing judicial gloss on the section. Further, it would be futile to attempt to do so in this opinion. In *Lanzetta* v. *New Jersey*, 306 U.S. 451 [83 L.Ed. 888, 59 S.Ct. 618], the defendants were convicted under an impermissibly vague state statute. After their conviction the state Supreme Court had tried to give more definitiveness to the statute in a case entitled *State* v. *Gaynor*, 119 N.J.L. 582 [197 A. 360]. The Supreme Court said, however: "It would be hard to hold that, in advance of judicial utterance upon the subject, [appellants] were bound to understand the challenged provision according to the language later used by the court." (306 U.S. at p. ·456 [83 L.Ed. at p. 892].) Whether the vice of a challenged statute is vagueness or overbreadth, should make no difference. The vice of mirroring a defendant's conduct against a narrowing judicial definition not yet handed down at the time of the alleged crime is the same: as to him the law is *ex post facto* (*Bouie* v. *City of Columbia*, 378 U.S. 347, 353-354 [12 L.Ed.2d 894, 899-900, 84 S.Ct. 1697]) and he has not had fair warning of what he may not do. The United States Supreme Court has applied the rule quite indiscriminately in cases involving vagueness, overbreadth or both. (*Shuttlesworth* v. *Birmingham, supra,* 394 U.S. 147, 153-155 [22 L.Ed.2d 162, 168-170]; *Gregory* v. *Chicago, supra,* 394 U.S. 111, 121-122 [22 L.Ed.2d 134, 141-142] (concurring opinion); *Ashton* v. *Kentucky, supra,* 384 U.S. 195, 198 [16 L.Ed.2d 469, 471]; *Shuttlesworth* v. *Birmingham,* 382 U.S. 87, 91-92 [15 L.Ed.2d 176, 179-180, 86 S.Ct. 211]; *Bouie* v. *City of Columbia, supra,* 378 U.S. 347, 352-353 [12 L.Ed.2d 894, 899-900].) If the statute cannot be saved by an intervening judicial decision, a fortiori a narrowing construction in the very case under consideration cannot be adequate to convey to the defendant that which he should have been told at the time of his alleged criminal act.[27]

We now turn to the statute. Unless we were to say that it is vague—which would dispose of the problem—it's sweep is indeed broad. The defined victim is a "public school." That presumably encompasses the buildings and grounds as such, which can surely be "disturbed" by certain activities, as well as the occupants who are in the buildings and on the grounds for purposes to which these are devoted. The word "disturb" itself may refer to conduct objectively disturbing as well as conduct disturbing to the victim, though objectively placid. The addition, in the statute, of the word "wilfully" merely "implies a purpose or willingness to commit the act and although it does not require an evil intent, it implies that the person knows what he is doing, intends to do what he is doing and is a free agent." (*People*

[27]See also Justice Reppy's concurring opinion with respect to the significance, in this connection, of *In re Kay,* 1 Cal.3d 930 [83 Cal.Rptr. 686, 464 P.2d 142].)

v. *McCaughey*, 261 Cal.App.2d 131, 135 [67 Cal.Rptr. 683].) Literally it is thus apparent that the United States Supreme Court must have "wilfully disturbed" the public schools affected by its holding in *Brown* v. *Board of Education*, 347 U.S. 483 [98 L.Ed. 873, 74 S.Ct. 686, 38 A.L.R.2d 1180].

In *Landry* v. *Daley*, 280 F.Supp. 968, the plaintiffs attacked the constitutionality of a Chicago ordinance reading in part as follows: "All persons who shall make, aid, countenance or assist in making any improper noise, riot, disturbance, breach of the peace or diversion tending to a breach of the peace, within the limits of the city . . . shall be deemed guilty of disorderly conduct . . ." Speaking of the "disturbance" portion of the ordinance, the court said: "Also proscribed is making, aiding, countenancing or assisting in the making of a *'disturbance'* which Webster defines in part as 'an interruption of a state of peace or quiet,' or 'an interference with a planned, ordered or regular procedure, state or habit.' *Again this is both too vague and indefinite as well as overbroad. The legitimate exercise of freedom of speech, press or expression frequently interrupts a state of peace or quiet or interferes with a planned, ordered or regular procedure, state or habit. New ideas more often than not create disturbances, yet the very purpose of the First Amendment is to stimulate the creation and dissemination of new concepts.* The prohibition against making or countenancing a disturbance would literally make it a crime to deliver an unpopular speech which results in a 'disturbance' or to stand by while someone else makes such a speech. This is clearly an invalid restriction of protected rights." (280 F.Supp. 968 at pp. 970-971.) (Italics added.)[28]

It takes little imagination to show that the purest exercise of the right of free speech may come within the meaning of section 16701. To use the same example as the court in *Landry* v. *Daley, supra,* 280 F.Supp. 968, 971: what about a guest lecturer who paints a gloomy picture of the prospects of peace in Vietnam and tells the students that all boys will have to go there eventually or that it is inevitable that the conflict will spread and that we shall all perish in an atomic explosion; or what about a student politician who in a campus speech advocates the abandonment of the American form of govern-

[28]The court went on to say: "The distinction between 'disturbance' and 'riot' is, of course, very relevant. Webster defines the latter as 'an assemblage of three or more persons in a public place for the purpose of accomplishment by concerted action and in a turbulent and disorderly manner a common purpose irrespective of the lawfulness of the purpose.' Nothing said here is intended to hold or imply that making or aiding or assisting to cause a riot may not be proscribed even though the actions taken consist merely in the exercise of First Amendment freedoms if the words spoken or written or the actions taken under the circumstances constitute a 'clear and present danger' that a riot will result and the requisite intent to cause a riot is present. . . ." (280 F.Supp. at p. 971.) Needless to say, nothing in this opinion takes issue with these views.

ment and extols the glories of Nazism? (*People* v. *Huss,* 241 Cal.App.2d 361, 366-370 [51 Cal.Rptr. 56].) It will not do to say that surely no court would hold that such matters are covered by the statute or that, if they are, the statute is to that extent unconstitutional. If that were an answer, the entire concept of overbreadth is illusory and there would be no need to legislate with "narrow specificity"; most of the Supreme Court's cases invalidating state or federal statutes on the ground of overbreadth would not have to have been written. Two examples will suffice: In *Shelton* v. *Tucker,* 364 U.S. 479, 488 [5 L.Ed.2d 231, 237, 81 S.Ct. 247], a state statute requiring teachers to file affidavits disclosing associational affiliations was struck down because it required disclosures of some associations that had "no possible bearing upon the teacher's occupational competence or fitness." The court struck down the statute as a whole. It did not require the teachers, at their peril, to guess what associations they could constitutionally be required to disclose. In *Aptheker* v. *Secretary of State,* 378 U.S. 500 [12 L.Ed.2d 992, 84 S.Ct. 1659], a federal statute made it a crime for any member of an organization required to be registered pursuant to the Subversive Activities Control Act of 1950 to apply for or use a passport. The statute failed to distinguish between members who knew of the subversive aims of the organization and those who did not. It was struck down in spite of the fact that it was conceded that the appellants involved were top-ranking leaders of the Communist Party.[29]

The entire problem was neatly summed up in *Dombrowski* v. *Pfister, supra,* 380 U.S. 479, 486-487 [14 L.Ed.2d 22, 28-29] as follows: "A criminal prosecution under a statute regulating expression usually involves imponderables and contingencies that themselves may inhibit the full exercise of First Amendment freedoms. See, *e.g., Smith* v. *California,* 361 U.S. 147. When the statutes also have an overbroad sweep, as is here alleged, the hazard of loss or substantial impairment of those precious rights may be critical. For in such cases, the statutes lend themselves too readily to denial of those rights. The assumption that defense of a criminal prosecution will generally assure ample vindication of constitutional rights is unfounded in such cases. See *Baggett* v. *Bullitt, supra,* at 379. For '[t]he threat of sanctions

---

[29]Another way of looking at the same problem is to ask whether the constitutional parts of the statute can be severed from the unconstitutional aspects. Our own Supreme Court has said: "Where a provision encompasses both valid and invalid restrictions on free speech and its language is such that a court cannot reasonably undertake to eliminate its invalid operation by severance or construction, the provision is void in its entirety regardless of whether the particular conduct before the court could be constitutionally regulated and whether there is a severability clause applicable to the provision. (See, e.g., *Thornhill* v. *Alabama, supra,* 310 U.S. 88, 96-99 [84 L.Ed. 1093, 1098-1100, 60 S.Ct. 736]; *In re Blaney, supra,* 30 Cal.2d 643, 655-656 [184 P.2d 892].)" (*Fort* v. *Civil Service Commission,* 61 Cal.2d 331, 339-340 [38 Cal.Rptr. 625, 392 P.2d 385]; see also *In re Berry, supra,* 68 Cal.2d 137, 156-157.)

may deter . . . almost as potently as the actual application of sanctions. . . ." (*N.A.A.C.P.* v. *Button,* 371 U.S. 415, 433.) Because of the sensitive nature of constitutionally protected expression, we have not required that all of those subject to overbroad regulations risk prosecution to test their rights. For free expression—of transcendent value to all society, and not merely to those exercising their rights—might be the loser. Cf. *Garrison* v. *Louisiana,* 379 U.S. 64, 74-75. For example, we have consistently allowed attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity. *Thornhill* v. *Alabama,* 310 U.S. 88, 97-98; *N.A.A.C.P.* v. *Button, supra,* at 432-433; cf. *Aptheker* v. *Secretary of State,* 378 U.S. 500, 515-517; *United States* v. *Raines,* 362 U.S. 17, 21-22, We have fashioned this exception to the usual rules governing standing, see *United States* v. *Raines, supra,* because of the '. . . danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application.' *N.A.A.C.P.* v. *Button, supra,* at 433. If the rule were otherwise, the contours of regulation would have to be hammered out case by case—and tested only by those hardy enough to risk criminal prosecution to determine the proper scope of regulation. Cf. *Ex parte Young, supra,* at 147-148. By permitting determination of the invalidity of these statutes without regard to the permissibility of some regulation on the facts of particular cases, we have, in effect, avoided making vindication of freedom of expression await the outcome of protracted litigation. Moreover, we have not thought that the improbability of successful prosecution makes the case different. The chilling effect upon the exercise of First Amendment rights may derive from the fact of the prosecution, unaffected by the prospects of its success or failure. See *N.A.A.C.P.* v. *Button, supra,* at 432-433; cf. *Baggett* v. *Bullitt, supra,* at 378-379; *Bush* v. *Orleans School Board,* 194 F.Supp. 182, 185, affirmed *sub nom. Tugwell* v. *Bush,* 367 U.S. 907; *Gremillion* v. *United States,* 368 U.S. 11."

For these reasons Justice Reppy and the writer believe that section 16701 of the Education Code is overbroad. We therefore do not reach the issue on which we differ: whether, applying First Amendment standards, there is any evidence to support the charge that petitioners or any of them conspired to violate the section.

## THE MISDEMEANOR COUNT—COUNT VIII

Count VIII of the indictment charges that petitioners Lopez, Olmeda, Ramirez and David John Sanchez did ". . . maliciously disturb the peace and quiet of a neighborhood and person, by loud and unusual noise, and by tumultuous and offensive conduct, and by the use of vulgar, profane and indecent language within the presence and hearing of women and children,

in a loud and boisterous manner." The initial briefs by the parties before this court and the oral arguments did not deal with the proper disposition of count VIII in the event the court thought it necessary to prohibit further prosecution of the felony counts. We therefore addressed an inquiry to the parties which, not surprisingly, resulted in divergent views. Relying on *People* v. *Hardin,* 256 Cal.App.2d Supp. 954 [64 Cal.Rptr. 307], the People contend that count VIII should simply be transferred to the municipal court for trial.[30] (*Gomez* v. *Superior Court,* 50 Cal.2d 640, 643 [328 P.2d 976].) The facts of *Hardin* are excerpted in the footnote. They are quite different from those in the case at bar, the only similarity being that there, as here, the prosecutor felt compelled to join a misdemeanor with a felony because of section 654 of the Penal Code as interpreted in *Kellett* v. *Superior Court,* 63 Cal.2d 822 [48 Cal.Rptr. 366, 409 P.2d 206].

In response to our inquiry petitioners have brought to our attention certain matters of which we may properly take judicial notice (Evid. Code, § 459), the correctness of which is not disputed by the People.

It appears that several weeks before petitioners were indicted by the grand jury on May 28, 1968, the four petitioners named in count VIII had, on March 6, 1968, been named in a misdemeanor complaint in the Municipal Court of the East Los Angeles Judicial District. One count of that complaint charged a violation of section 415 to have been committed on March 5, 1968, at 5101 East Sixth Street, the address of Garfield High School.[31]

On June 7, 1968, petitioners' counsel and a deputy district attorney appeared in the municipal court. The People moved to dismiss the misdemeanor complaint on the ground that "[s]ubsequent to the complaint and

---

[30]In *Hardin* a complaint charging the defendants with a felony and a misdemeanor was filed in the municipal court. After a preliminary hearing the magistrate found the evidence insufficient on the felony count and dismissed it. He did, however, order defendants to appear in the superior court on the misdemeanor count. As soon as they appeared in that court it realized that it had no jurisdiction to try the misdemeanor count and ordered defendants to appear in the municipal court the next day. In that court, over their objection, an amended complaint charging them only with the misdemeanor was filed. A motion to dismiss for failure to bring defendants to trial within the statutory time (Pen. Code, § 1382) was granted because more than the statutory time had elapsed since their initial arraignment on the felony-misdemeanor charge. On the People's appeal that order was reversed, the court holding that the time consumed by the abortive preliminary hearing and appearance in the superior court did not cause the time limitations of section 1382 to come into play, because the defendants' appearance for the preliminary hearing was not an appearance in an "inferior court," as distinguished from an appearance before a magistrate.

[31]The misdemeanor complaint, in addition to the specifications contained in count VIII of the indictment also charged that defendants disturbed the peace by "threatening, traducing, quarrelling, challenging to fight and fighting."

before any plea had been entered by any of the parties to the complaint, a Grand Jury Indictment was obtained against subjects Lopez, Sanchez, Ramirez, and Olmeda, charging a violation of PC 182 (Conspiracy to Riot and Disturb the Peace). . . ."

The court was not informed that a misdemeanor count in the grand jury indictment apparently duplicated a count in the complaint sought to be dismissed. We attach no sinister significance to that fact. The deputy who made the motion does not appear to have been involved in the grand jury proceedings. In any event, it seems certain that the felony charges overshadowed everything else. Before the conclusion of the municipal court session the following colloquy took place: ". . . MR. HERRING [defense counsel]: Your Honor, may I request one minor clarification of the order dismissing the case? THE COURT: Yes, sir. MR. HERRING: May it be understood by the defendants that this case is being dismissed with prejudice to the refiling of similar Counts against these defendants? THE COURT: Well, what is your position, Mr. Devich? MR. DEVICH [deputy district attorney]: Well, under the Penal Code, once a misdemeanor is dismissed, another misdemeanor cannot be filed. However, it does not preclude a felony being filed, even upon the same set of circumstances, the same facts. MR. HERRING: I understand that, but I want it perfectly clear, if possible, that should the felony prosecution for any reason not prevail, these defendants will not be faced by a new misdemeanor Complaint reciting the same Counts. THE COURT: I presume that Mr. Devich is giving that assurance to you. I do not know. MR. DEVICH: Well, the code says I can't. What more can I say, Your Honor? THE COURT: Is that your answer, Mr. Herring? MR. HERRING: Thank you. THE COURT: I have dismissed the Complaint under Section 1385, for the reasons that are very thoroughly set forth in that memorandum that Mr. Devich aluded to and the entire contents of which are now going to be incorporated into the record. MR. HERRING: The only reason I raised the question, Your Honor, is—the reasons, many of them, are conditioned upon the pending status of felony litigation. THE COURT: Well, I will tell you one thing. This Court would be very, very disinclined to want to permit a new filing on this case in the event that the felony prosecution downtown was unsuccessful, because our case load is too heavy to permit continued harassment ourselves. But that is not going to happen, because it can't be done in the first place. . . ."

Petitioners now claim that the dismissal is a complete bar to count VIII. Section 1387 of the Penal Code reads as follows: "An order for the dismissal of the action, made as provided in this chapter, is a bar to any other prosecution for the same offense if it is a misdemeanor, but not if it is a felony." The municipal court seems to have been under the misapprehension that the dismissal of an action, not a felony, is only a bar to another

prosecution, if the new complaint is filed after the first action is dismissed. That is not correct. In *People* v. *Aiken,* 108 Cal.App.2d 343 [238 P.2d 1019], the sequence of events was as follows: May 12, 1951: complaint charging violation of former section 502 of the Vehicle Code (Veh. Code, § 23102—misdemeanor drunk driving) filed in class B justice court. May 15, 1951: second complaint charging the same violations and a prior conviction for a violation of the same section filed in the same justice court. May 16, 1951: first complaint dismissed "on account of the filing of another action. . . ."

A preliminary hearing on the second complaint was held in the justice court and defendant was bound over. Later a motion to dismiss under the provisions of section 1387 of the Penal Code was granted by the superior court. Its order was affirmed by the District Court of Appeal.

It is apparent that at the time the first action was dismissed, the second was already pending. The *Aiken* case is, however, even more significant for our purposes. The reason why a second complaint was filed in that case was that a class B justice court had no jurisdiction to try a highgrade misdemeanor. A violation of section 502, coupled with a charge of a prior violation, was such a misdemeanor. Similarly, in the case at bar, the People obviously caused count VIII to be included in the indictment because under the *Kellett* rule all charges had to be presented in one action and the municipal court had no jurisdiction to try the felonies. Were it not for one possible point of difference, *Aiken* would be controlling and we would be forced to say that the dismissal of the municipal court complaint was an absolute bar to count VIII being tried in any court. This is the difference: in *Aiken* the parties stipulated that both complaints were based on the same offense. In the case at bar the People make no such concession. They do not concede "identity of transactions" between the dismissed misdemeanor count and count VIII of the indictment. This represents a factual issue which this court is in no position to resolve. We must therefore deny the writ as to count VIII and direct the superior court to initiate appropriate proceedings to resolve any question whether the offense which the People claim to underlie count VIII is separate from that for which the four petitioners concerned were charged in the municipal court. In connection with any such hearing the attention of the superior court is, however, directed to another problem which it will have to resolve before taking further appropriate action: regardless of the precise facts which the People may claim to support the misdemeanor complaint in the municipal court, the problem remains whether, quite apart from section 1387, *Kellett* prevents any further prosecution on count VIII. Even if

the municipal court complaint and count VIII charged different acts, if the proof should reveal that the prosecution was, or should have been, aware "of more than one offense in which the same act or course of conduct [played] a significant part," its failure to "unite all such offenses will result in a bar to subsequent prosecution" of count VIII. (*Kellett* v. *Superior Court,* 63 Cal.2d at p. 827 [48 Cal.Rptr. 366, 409 P.2d 206].) We are aware that Kellett provides certain escapes from its rule and assume, without deciding, that the instances mentioned in that case are not exclusive. Naturally the People are free to attempt to show why *Kellett* is inapplicable to count VIII.

Let a peremptory writ of prohibition issue restraining the respondent court from further prosecution of counts XV and XVI of the indictment. With respect to count VIII the petition for a writ of prohibition is denied and the superior court is directed to proceed in a manner consistent with this opinion.

**STEPHENS, J.**—I fully concur in the opinion written by Presiding Justice Kaus as it relates to count VIII (disturbance of the peace, Pen. Code, § 415).

I concur in the result reached in the opinion as it relates to count XVI (conspiracy to disturb the peace, Pen. Code, § § 182 and 415), but not, however, for the reasons stated in the opinion. The case of *In re Bushman,* 1 Cal.3d 767 [83 Cal.Rptr. 375, 463 P.2d 727] disposes of the contention that Penal Code section 415 is vague or overbroad. A full and fair reading of the transcript discloses that the evidence relied upon to support this count is inadequate to be of "ponderable legal significance," "reasonable in nature, credible, and of solid value." (*Estate of Teed,* 112 Cal.App.2d 638 [247 P.2d 54].) There must be a reasonable basis for the belief that the accused may be guilty of the crime. (*Jackson* v. *Superior Court,* 62 Cal.2d 521 [42 Cal.Rptr. 838, 399 P.2d 374]; *Robison* v. *Superior Court,* 49 Cal.2d 186 [316 P.2d 1]; *Lorenson* v. *Superior Court,* 35 Cal.2d 49 [216 P.2d 859]; Witkin, Cal. Criminal Procedure (1963) § 234, p. 218. See also, fn. 4, p. 680 of the lead opinion and reference to the same fact on p. 682 thereof.)

I concur in the result reached in the opinion as it relates to count XV (conspiracy to violate Ed. Code, § 16701). To my mind, however, Education Code section 16701 is neither ambiguous, vague nor overbroad. To say that to instigate a student walkout from classes in session is not subject to prohibition is unthinkable, and the opinion by Presiding Justice Kaus does not so hold. Here, the purpose of the walkout may be deter-

mined as one to effectively close the schools involved—not to directly espouse a grievance. Even if the purpose was a lawful one, there is here a prime example of conflict between two ideologies equally important to our national survival.

The prohibition against a person's wilful disturbance of a public school does not transgress the First Amendment rights of free speech and assembly. To so hold is to sound the death knell for a school system of education.

In the first Constitution for this state, it was recognized that it was necessary to provide a system of education for resident children. That Constitution of 1849 (art. IX) obligated the Legislature to encourage the promotion of intellectual, scientific, moral, and agricultural improvement, and provided for school funding. It made mandatory a school system which would be kept open at least three months in every year. In 1851, the Legislature passed its first School Act (Stats. 1851 ch. 126, p. 491), consisting of nine pages. Today, the codification has been extended to over 31,000 sections of the Education Code.[1]

It is generally recognized that children are required (with certain exceptions) to attend school until they have completed high school, or become 16 years of age, and that parents are obligated to send their children of 6 to 16 years of age to school. (Ed. Code, §§ 12101 and 12201.) It cannot be questioned but that education is a prime dedication of our system of government. Certainly, where one principle fostered in constitutional provisions would conflict with another fostered principle under one construction of the law, and those principles would not be in conflict under another construction of the law, the courts must adopt the construction which gives effect to both principles.

Since two persons cannot be understood when both talk at the same time, free speech is not hampered merely because one of the two is then made to remain silent; free assemblage is not violated just because one group lawfully occupies a location to the exclusion of another. However, anyone who conspires with others to cause high school students to abandon their classes and achieves such purpose by causing a "walkout" during the school session certainly "disturbs"—to the point of extinction—the "school," for a building without students is not a school, except in name only.

People have a constitutional right to air their grievances, but to hold that there is no right to control the time or place is to succumb to words over meaning. Freedom of expression may not be used to deny others the right to an education. I do not wish to be misunderstood. I do not say that

---

[1]One publisher of the codes has printed the Education Code in seven volumes (Deering); and another, in six volumes (West).

a student may not express his grievances by walking out, for there is no prohibition in Education Code section 16701 against this—such an absence, though wilful, is not a disturbance, but a step toward truancy. I therefore do not base my concurrence upon a theory of overbreadth of section 16701.[2] It is sufficient citation of authority on the question of "overbreadth" to cite the latest analysis by the California Supreme Court in *In re Kay,* 1 Cal.3d 930 [83 Cal.Rptr. 686, 464 P.2d 142]. The court in *Kay* had before it a similarly worded statute (Pen. Code, § 403: "every person who . . . willfully disturbs or breaks up any assembly or meeting . . ."). The court was careful to restrict its holding to (1) the facts established in a full trial which resulted in conviction and sentence; and (2) the instruction given by the trial court. As *Kay* states at page 941: ". . . [T]he trial court simply read, verbatim, the language of section 403. In such a broad unrestricted rendition the court invited the jury to apply the statute unconstitutionally and to find individuals guilty of nothing more than an expression of free speech protected by the Constitution. Thus the jury, under such an instruction, might convict persons whose expressive conduct 'disturb[ed]' a meeting only because the content of the expression conflicted with the views espoused by the meeting's organizers or official speakers." After expressly recognizing a presumption that the legislative intent was to enact a valid statute (§ 403), the court in *Kay* stated that section 403 "authorizes the imposition of criminal sanctions only when the defendant's activity itself— and *not* the content of the activity's expression—substantially impairs the effective conduct of a meeting." In *Kay,* the court clearly inferred that *under appropriate facts and limiting instructions,* section 403 could be constitutionally applied.

Here, we are presented with the factual allegations at the indictment stage. After a full trial and under proper instructions, a jury might well find that the acts complained of were not in furtherance of a means of expressing grievances, and it is for the fact finding body, and not this court on consideration of this writ, to draw that conclusion. I concur in the result because the act of the several defendants, though committed by plan and design, is by its very nature one which constituted a low-grade misdemeanor and which is more consistent with what is now classified as an *infraction* in the Penal Code: i.e., the disturbance caused by the walkout. Further, there being no danger of enlarging the crime by conspiratorial planning, it remains

[2]Education Code, section 16701 (as of the date of the alleged offense): "Any person who wilfully disturbs any public school or any public school meeting is guilty of a misdemeanor, and punishable by a fine of not less than ten dollars ($10) nor more than one hundred dollars ($100)."

Section 16701 was amended in 1969 to read as follows: "Any person who willfully disturbs any public school or any public school meeting is guilty of a misdemeanor, and shall be punished by a fine of not more than two hundred fifty dollars ($250).

but the *act* prohibited. Any conspiracy which raises such a violation to a more onerous status is encompassed within the more serious charge of breach of the peace (Pen. Code, § 415), or other specifically prohibited violent and dangerous act. It is unconscionable to create a felony from the cooperative commission of this misdemeanor by two or more persons. At the time of the alleged violation, as now, the misdemeanor was of such nature that the Legislature provided that no jail term could be countenanced. As a result of the instant charge, a jail term, including a sentence to state prison, and the brand of felon, are possiblities. (Pen. Code, § 182 in pertinent part provides: "If two or more persons conspire: 1. To commit any crime . . . . When they conspire to do any of the other acts [including 1.] described in this section they shall be punishable by imprisonment in the county jail for not more than one year, or in the state prison for not more than three years, or by a fine not exceeding five thousand dollare ($5,000) or both.") I recognize that the violations of the code sections applicable here have been designated as misdemeanors and have not been reclassified as infractions, as have some Vehicle Code violations. Also, it must be conceded that there are other misdemeanors for which the penalty does not include a jail term, in the alternative or otherwise. But the clear legislative intendment relative to low-grade penal violations is to protect the individual from the "criminal" stigma.[3] To my mind, it seems only reasonable to hold that where, as in the instant case, the prohibited act itself cannot become more heinous because of the planned action of two or more persons, the gravity of the violation does not increase to the extent of warranting a felony classification. Of course, where the cooperative activity is of a more grievous nature, the more serious Penal Code violation (§ 415, disturbing the peace) is applicable.

For these reasons, I concur in the result reached in the opinion by Presiding Justice Kaus as it relates to count XV.

**REPPY, J.**—I concur in part and dissent in part with respect to the scholarly lead opinion of Presiding Justice Kaus, and I disagree with part of the views expressed by my colleague, Justice Stephens. I do not reach his subject and treatment in another part.

I concur with the lead opinion's handling and disposition of count VIII (the misdemeanor charge), as does Justice Stephens.

I concur with the lead opinion's determination (made in dealing with count XV) that section 16701 of the Education Code is overbroad.[1] The

---

[3]The concept of infraction has been developed to achieve this desired result. (See Pen. Code, §§ 17 and 19c.)

[1]Because of this holding, it is not necessary to pass on the question of whether the section is vague.

action words in that section "willfully disturb" unaccompanied by narrowing modifiers such as "maliciously" or "by tumultuous or offensive conduct" or unlimited by precise application as to time, purpose, means and nature of scholastic activity disturbed, allow it to encompass conduct of a too innocuous nature. (See *N.A.A.C.P.* v. *Button,* 371 U.S. 415, 432 [9 L.Ed.2d 405, 417, 83 S.Ct. 328] and other cases cited by Presiding Justice Kaus in the lead opinion.) Section 16701 appears to be unconstrued by appellate decisions, and so it lacks the well-established meaning that affords the requisite advance definiteness which has clothed Penal Code section 415, as indicated in *In re Bushman,* 1 Cal.3d 767 [83 Cal.Rptr. 375, 463 P.2d 727].

A series of higher, guiding decisions indicate that should section 16701 now be given a limited construction, that circumstance cannot be used against petitioners. (See *Bouie* v. *City of Columbia,* 378 U.S. 347, 351-353 [12 L.Ed.2d 894, 898-900, 84 S.Ct. 1697], and other cases cited by Presiding Justice Kaus.) In the case of *In re Kay,* 1 Cal.3d 930 [83 Cal.Rptr. 686, 464 P.2d 142], the Supreme Court carved out a narrow construction for Penal Code section 403 in order to save it from overbreadth. However, because it reversed the conviction on two particular grounds,[2] it did not have to face the question of whether the conduct of a defendant could be judged by the initially refined meaning of a statute which, but for such then declared refinement, would be overbroad, in contravention of the line of cases above mentioned, holding, in effect, that a defendant is entitled to advance notice of a "saving" construction of a prima facie overbroad statute.

I dissent as to the lead opinion's determination (made in dealing with counts XV and XVI) that use of the conventional rule of circumstantial evidence in conspiracy cases (to wit, that conduct of persons at the time of a planned event can be proved to allow the drawing of an inference that certain of the things done were part of the plan and that certain of the participants were conspirators) should be judicially proscribed in cases where First Amendment rights are involved, because it "chills" the allegedly legitimate exercise of the right of expression of grievances by actual or symbolic speech protected by that amendment.

[2]The grounds of decision were these: (1) That defendants' conduct at the political meeting was not violative of the section under its narrow construction because it did not consist of intentionally committed acts in violation of implicit customs or usages of which they, as reasonable men, should have known which substantially impaired the conduct of the meeting; and (2) that the jury was instructed overbroadly because given only the unglossed wording of the code section.

With respect to count XV, I feel that the issue is moot because of the concurrent holding of Presiding Justice Kaus and mine that section 16701 of the Education Code is overbroad. The issue is viable, however, with respect to count XVI, which charges a conspiracy to violate Penal Code section 415 (maliciously and wilfully disturbing the peace of the schools by tumultuous and offensive conduct), because it has been held that section 415 is neither overbroad nor vague. (*In re Bushman, supra,* 1 Cal.3d 767.)[3]

What is "chilled" and for what purpose must be considered in the context of the subject matter of this case, which is the facilities and processes for the education of high school students. The high school boys and girls of varying ages and degrees of maturity who are involved are in their formative stage under the discipline and social training of their parents. The school, in part, is expected to endorse and supplement this parental role.

The effective and orderly education and training of the young people is a matter of major importance and of high social value to the citizenry of the community. It is constitutionally recognized. (See citations in accompanying opinion of Justice Stephens; also analysis of social importance of an appropriately disciplined and continuously efficient educational process rendered in *Mandel* v. *Municipal Court,* 276 Cal.App.2d 649 [81 Cal.Rptr. 173].) The petitioners herein point out that there was a desire on the part of a number of Spanish surnamed students, which they, the petitioners, felt should be championed,[4] to assert the grievance that they, the students, were not receiving the good education and training which was their due.[5] These were the respective aims under consideration.

Also, there must be examined against what it is that there is concern that the conspiracy rule of circumstantial evidence will cause a "chill" to operate. I see it as any given group's planning of and pressuring for a. student demonstration of grievances against claimed inadequacies of the school system which will involve the aggressive exhortation of students to walk out on their scheduled educational program, without determining

---

[3]*Bushman* defines what is tumultuous and what is offensive conduct, and what is a disturbance caused by such conduct. Disturbance means: disruption of public order by acts that are themselves violent or that tend to incite others to violence. Tumultuous conduct is violent conduct that wilfully and maliciously endangers public safety or order. Conduct is offensive if, by the person's actions, he wilfully and maliciously incites others to violence.

[4]The adults chose a method which involved student participation presumably because of its dramatic effect.

[5]But petitioners evidently felt that the students had to be convinced that the petition for grievance should take the form of a walkout during regular school hours. There was testimony that in October 1967 Mr. Castro urged that a walkout was the only way to impress "the kids" as well as the school board.

whether the various sets of parents would want their children participating in that type of demonstration even if they were in sympathy with the cause. No one would dispute that the taking place of such a walkout would bring about a disruption of school routine (Ed. Code, § 10609); and school witnesses made it clear that the period of disruption was not limited to the time of the intrusion by the exhorting petitioners and of the ensuing walkouts, but that it persisted for many weeks thereafter. Certainly parents of children of this age have a say in whether other adults should embroil their children in a demonstration so disruptive of the educational regime.[6]

It is not reasonable to believe that contemplation of the possibility of involvement in felony conspiracy proceedings because of the accepted use of the circumstantial evidence rule under consideration would frighten people from planning a demonstration which did not involve the student walkout feature, such as gathering adjacent to a school facility at the time of class dismissal. The concept apparently is that future would-be adult proclaimers of grievances concerning the educational system (whose First Amendment rights are hypothetically relied upon by petitioners) would be loathe to plan a demonstration not involving student walkouts during regular school hours for fear that students might become aware of the activity and, on their own initiative, engage in a walkout disruptive of the school operation and for fear that by the rule of circumstantial evidence proposed to be used in this case they, the adults, likely would be required to answer felony charges of conspiracy to cause the student walkout. The engenderment of such a fear, in my opinion, is too remote for judicial cognizance.

Further, I feel that a student walkout during regular school hours could not be expected to be accomplished without violation of a valid law such as section 13558.5 of the Education Code[7] or section 609.2 of the Penal Code (then in effect)[8] or what could be a valid law (§ 16701 of the

---

[6]Nothing in the record points to a consultation with parents to secure their approval of the involvement of their children.

[7]Section 13558.5 reads in part as follows: "Every . . . adult who is not a pupil of the school . . . who comes upon any school ground or into any schoolhouse and there willfully interferes with the discipline, good order, lawful conduct, or administration of any school class or activity of the school, with the intent to disrupt, obstruct, or to inflict damage to property or bodily injury upon any person is guilty of a misdemeanor . . . ."

(See reference in footnote No. 3 of the lead opinion.)

[8]Section 609.2 (Stats. 1967, ch. 1161, p. 2845) read in part as follows: "Any person who comes into any school building or upon any school ground, or street, sidewalk, or public way adjacent thereto, without lawful business thereon, and whose presence or acts interfere with the peaceful conduct of the activities of such school or disrupt the school or its pupils or school activities, and who remains there, after being asked to leave by the chief administrative official of that school or any designated agent . . . who carries out the same functions . . . or, in the absence of the chief admin-

Ed. Code made more precise), or without causing students to transgress rules for decorum and class attendance, thereby to be in violation of section 10609, Education Code,[9] (see *Mandel* v. *Municipal Court, supra,* 276 Cal.App.2d 649, 670, and fn. 10; Op. Leg. Counsel, Assem. J. (1967) p. 5028), or without contravening the social ideal of an ordered and efficient educational process. I do not say that petitioners have no standing to claim unconstitutional procedure. I say that the only foreseeable deterrence to the exercise of First Amendment rights because of fear of consequences of felony involvement is one based on an intended exercise of rights of the nature and with the probable repercussions of those carried out by petitioners, and that such a deterrence is defensible. The government has done no wrong if knowledge of a logical trial process for allowing a fact-finder to sift for the truth makes future would-be organizers of mass school grievance protests reticent to violate, or cause the violation of such laws, rules or standards, particularly when other times, places and means are available to them for making their grievances known in an adequate, although perhaps less dramatic and effective manner. The logic of the less drastic alternative should work both ways. At times, laws which place too severe a repressant against individual rights in the name of a valid public objective are thrown out because a less drastic measure can be used to adequately reach the desired end. (*Aptheker* v. *Secretary of State,* 378 U.S. 500, 513-514 [12 L.Ed.2d 992, 1001-1002, 84 S.Ct. 1659];[10] see also *United States* v. *Spock,* 416 F.2d 165, 170.[11]) *Mandel, supra,* stresses the reverse application, saying that there must be appraised the "alternatives available to the speaker . . . to exercise his right to effective communication in a manner less hostile to the governmental interest . . . ."

Certainly there should be no rule against the use of evidence of conduct at the event as a basis for inferences as to what was planned and who was planning (1) where some foundational direct evidence is available, as there was here, to show that there were plans for a student walkout[12] and that

---

istrative official, the person acting as the chief administrative official, is guilty of a misdemeanor."

(See *People* v. *Woods,* 7 Cal.App.3d 382 [86 Cal.Rptr. 508], for point of subordinate acting for chief administrative official.)

[9]Section 10609 reads as follows: "All pupils shall comply with the regulations, pursue the required course of study, and submit to the authority of the teachers of the schools."

[10]". . . Congress has within its power 'less drastic' means of achieving the congressional objective of safeguarding our national security."

[11]". . . First Amendment rights . . . must prevail if . . . there is a 'less restrictive alternative' by which the . . . evil may be prevented."

[12]The very concept of a student walkout means a physical withdrawal at a time and place when there is not freedom to do so under school rules. As to Mr. Castro,

many of the participants in the ultimate event were planners,[13] and (2) where there is circumstantial evidence not related to at-the-scene conduct which bears on the plans and the planners.

There was other pre-event circumstantial evidence indicative of a full scale walkout of a type apparently not condemned by the lead opinion such as the making of picket signs and the arranging for monitors and the planning of their distribution during the walkouts to keep down excitement and to keep the students from getting angered by police action.

The lead opinion stresses that tumultuous and offensive action for its own sake was not the ultimate objective of petitioners. However, I think it must be accepted that it was the means chosen for making known the grievances, which was the ultimate objective.

The principle opinion says that our concern should be with those who sincerely desire to stay within the law while fully exercising their constitutional rights. It is my feeling that planners of teenage student walkouts during regular school hours without parental approval are not such persons.

The lead opinion states that unless we are prepared to say that anyone who organizes a demonstration by high school students assumes the risk of their misbehavior, we must hold that the First Amendment prohibits conspiracy prosecution through circumstantial evidence. This observation is at once both not sufficiently precise and not adequately comprehensive. We need to be more precise by referring to the organization of a student walkout during regular school hours as the "demonstration"; and we need to be more comprehensive by including among the risks allegedly assumed that the walkout will involve conduct by chosen adult-on-the-spot exhorters which will be violative of school rules or valid laws or what could be valid laws. I submit that we should be prepared to say that one who organizes such a demonstration does assume such risks, and we should have no cause to use the First Amendment as a bar to prosecuting suspected conspirators through circumstantial evidence.

Three decisions call for some particular remarks. The point stressed by the majority in *Spock* is that those aligned with the movement, which had the legal objective of opposition to the Viet Nam war and the draft, could

there is, in addition, his radio-speech-admission (receivable in evidence upon establishment of the corpus delicti of the offense) specifying the time for the call of the second walkouts (a specie of proof not akin to the type of circumstantial evidence catalogued as "chilling" in the lead opinion).

[13]A Mr. Gomez, one of the monitors, testified concerning meetings at which walkouts were planned and the distribution of monitors at the walkouts was worked out. He named some of the participants and indicated that there were others whose identity he could not then furnish.

be held as conspirators or not depending upon what means, legal or illegal, each intended was to be used to foster the objective. Even though a given person allied himself with the movement, he was not to be saddled with the intent of his more extreme cohorts. It was only as to this factor of intent that the *Spock* majority held that it would not allow the use of the device (conventionally used in conspiracy cases) of presenting the declaration of one conspirator as to the means he had agreed should be pursued to have the common views about the war and draft made known in order to establish the means that the defendant under consideration had agreed to. In the instant case nothing less than a class-time student walkout (with its offensive implications above discussed) was the plan of all. We have no problem of inculpation and noninculpation based on grades of intent.

The majority in *Spock* saw no impediment to the presentation, even at the jury trial, of post-planning conduct (circumstantial evidence) to allow identification of who were conspirators and determination of what actions had been planned. Evidently, the majority was not impressed by the "chilling" concept insofar as that trial feature was concerned. In the instant grand jury situation, strong suspicion of involvement in the conspiracy by each of the petitioners is shown by his individual presence and activity at various stages of the development and accomplishment of the walkouts.

The dissent in *Spock* was concerned with what it terms "the delayed fuse" approach to determining the conspiratorial culpability of signing a document like the "Call," and it felt that such approach would have a pronounced "chilling" effect "on all kinds of efforts to sway public opinion." Although this seems to be focusing on the rule of circumstantial evidence, the stand taken by the dissent was that because this is a conventional rule in conspiracy cases, there is good reason to hold that there actually is no conspiracy (and thus none of which a defendant can be found guilty) in such "amorphous coalitions" in the area of public discussion. The dissent outlines a progression of conspiracy situations short of the loose and shifting and openly made coalescence devoted to the expression of opinion on public issues, starting with closely knit groups directed at the execution of orthodox criminal enterprises, proceeding to those conspiracies in which a disciplined, cohesive, covert organization devotes itself with singleness of mind to one illegal purpose, and then mentioning a similar combination striving to accomplish a number of purposes, some legal and some illegal. I feel that the dissent would have ranked the Castro group as akin to either one of the latter two examples, and that it would not have considered the circumstantial evidence rule inappropriate even though it produced an effect which would "chill" the inclinations of future would-be grievance proclaimers to be among the members of and carry out the aims of such an organization.

Obviously this would be so if the sought objective—student walkout during school hours—was a statutory offense in itself or even a violation of district administrative regulations governing student conduct. There is nothing invidious about putting a "chill" on an inclinaton to violate the law in pursuit of securing acknowledgement of and corrective action for an alleged grievance. It is noted that the majority in *Spock* quotes from *Bond* v. *Floyd*, 385 U.S. 116 [17 L.Ed.2d 235, 87 S.Ct. 339], the phrase, "a call to unlawful refusal" in characterizing the letter-call to young men to refuse to be inducted. The adult action in the instant case can be categorized as a call to the students to perform an illegal act or at least to engage in behavior lastingly disruptive of an atmosphere congenial to the educational process.

It is significant that in *Mandel, supra,* where the contents of the complaint were under scrutiny, there was no allegation that the activity of the defendant, passing out anti-war draft and racism leaflets, drew the students, who gathered about, from their scheduled scholastic activity. Also, although there were allegations that defendant mentioned a future meeting at which a student walkout would be discussed, there was no charge of conspiracy to cause a walkout from classes.[14] There was no allegation that the meeting was to be held during school hours or even on a school day. The inference is clear that if the court writing *Mandel* had been examining a trial transcript which disclosed encouragement of students by the defendant to leave school while it was in session, its approach would have been different. At pages 673 and 674 the court says: "The facts alleged do not show advocacy which is directed to inciting . . . imminent lawless action—absentation from school"; quotes from *Tinker* v. *Des Moines Independent Community School Dist.*, 393 U.S. 503 [21 L.Ed.2d 731, 89 S.Ct. 733]: " 'But conduct by the student . . . which for any reason—whether it stems from time, place, or type of behavior—materially disrupts classwork or involves substantial disorder . . . is, of course, not immunized by the constitutional guarantee of freedom of speech.' "; and states: "Pamphleteers, however, cannot be violent and heedless of the rights of others, and must bow to appropriate discipline of the school." In leaving *Mandel* we note that it stresses the *weighing process*[15] in connection with the inquiry as to whether the vagrancy law there involved was being unconstitutionally applied. In the instant case we are employing the weighing process to determine if, indeed, it is wrong to put a "chill" on the inclination of persons to organize a demonstration to express grievances. We grant the legitimacy of an organ-

---

[14]The *Mandel* dissent felt this could have been alleged.

[15]Weighed is the extent of impairment of the exercise of First Amendment rights against the importance of the governmental interest and the substantiality of the threat which the speech activity poses to that interest.

ized showing of dissatisfaction with conditions in an educational institution as a means toward inducing consideration and alleviation. But we examine the value of the interest being disrupted by a drastic means, chosen as supposedly being the only one impressive enough to be effective; and we consider whether less extreme measures would be sufficiently effective, whether it is shown that the harsh maneuver is really necessary to impress, and whether the less drastic move had been made and been ignored.

Thus, if the student walkout was a violation of law or regulations made pursuant to law, and if the "chill" ran only toward discouraging that, and there was very small likelihood that it would discourage adult group demonstrations not intended to bring about student walkouts, no sufficient interference with rights of free speech is brought about by the circumstantial evidence rule available in the conspiracy prosecution.

I do not feel that the instant case is comparable to *Smith* v. *California,* 361 U.S. 147 [4 L.Ed.2d 205, 80 S.Ct. 215]. In *Smith* the inventorying for sale of unobscene books was considered discouraged because of the excessive burden cast upon the bookseller of finding out which ones they were. Here, the only thing discouraged is planning a demonstration of grievances which involves getting the students to walk out during regular school hours. The instant case is not akin to *New York Times Co.* v. *Sullivan,* 376 U.S. 254 [11 L.Ed.2d 686, 84 S.Ct. 710, 95 A.L.R.2d 1412], wherein the concern was that a speaker, in a speech concerning public officials, would censor his own comments and leave some legitimate ones out in order to be sure that he would not speak any actionable libel.

Reference is now made to the separate opinion of Justice Stephens.

As far as count XVI is concerned, I feel that, given the rule of circumstantial evidence and given the recognized standard of admeasurement of evidence supportive of action at the grand jury level, the evidence was of sufficient substance for the grand jury to have entertained a strong suspicion that at least some of the actions observed carried out at the scene by petitioners and others were planned by the alleged conspirators, and that those who were seen active on the school grounds were in on the organizing somewhere along the line.

With respect to count XV, I do not agree that there should be judicial proscription against the charging of a conspiracy to violate a low-grade misdemeanor as to which a limited fine is the only penalty. Perhaps the concept can be said to stem from two of the contentions stated by petitioners: (1) The state cannot constitutionally punish at the felony level where exercise

of First Amendment rights is involved; (2) the use of the conspiracy vehicle brings about cruel and unusual punishment. However, I do not feel that these factors should lead to the position taken.

The checkered holdings of our judicial triumvirate make it inappropriate to discuss the challenging question of the constitution of the grand jury which rendered the indictments and other contentions not covered in the above discussion.